46 P.3d 1

**STATE of Hawaii, Plaintiff–Appellee,**

v.

**Lloyd M. MOMOKI, Defendant–Appellant.**

No. 24101.

Intermediate Court of Appeals of Hawai'i.

April 15, 2002.

Rose Ann Fletcher, Deputy Public Defender, on the briefs, for defendant-appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Lloyd M. Momoki (Momoki) appeals the January 25, 2001 judgment of the district court of the first circuit, the Honorable Colette Y. Garibaldi, judge presiding, that convicted him of driving under the influence of drugs, in violation of Hawaii Revised Statutes (HRS) § 291–7 (1993),[1] and inattention to driving, in viola-

---

1. Hawaii Revised Statutes (HRS) § 291–7(a) (1993) provides that "[a] person commits the offense of driving under the influence of drugs if the person operates or assumes actual physical

tion of HRS § 291–12 (Supp.2001).[2]

On appeal, Momoki raises two issues germane to both convictions: (1) that there was insufficient evidence to support a finding that Momoki was driving the vehicle when the accident occurred; and (2) that in convicting Momoki of both driving under the influence of drugs and inattention to driving, the court violated HRS § 701–109(1)(e) (1993).[3] We affirm.

## I. Background.

Honolulu Police Department (HPD) officer Scott Kobayashi (Officer Kobayashi) testified that in the early morning of May 23, 2000, he was called to investigate a "motor vehicle collision" that occurred on Hawai'i Kai Drive, involving a Mazda MPV van registered to Momoki and his wife. The van caused property damage to two roadside residences, one of which was the house of an HPD sergeant, Damon Purdy (Sergeant Purdy).

Sergeant Purdy testified that he was sleeping when a house guest woke him up and told him about the accident. In less than a minute, Sergeant Purdy was outside. It was still dark. He saw that the stanchions supporting the garage portion of his roof had been "torn off," and trees and other foliage on his property had been knocked down. The van had ended up in his neighbor's carport. The neighbor's carport and two of the neighbor's vehicles had been "destroyed." Sergeant Purdy walked over to his neighbor's carport and saw that the van had landed "on its driver's side[.]" Sergeant Purdy saw Momoki getting out of the driver's side door of the van, "which was facing down[.]" "I could just see him sliding out with his feet towards me." Sergeant Purdy did not see anyone else exiting the vehicle. Sergeant Purdy then returned to his house to call the police.

Officer Kobayashi testified that he was the first on-duty officer to arrive at the scene. It was around 4:50 or 5:00 a.m. He saw a Mazda MPV van inside the garage of 6612 Hawai'i Kai Drive. The van appeared to be on top of another vehicle. Officer Kobayashi approached the van to check if there were any gasoline leaks, or if anyone was trapped inside. Upon determining that there were no gasoline leaks and no injuries, Officer Kobayashi proceeded to locate the driver. He approached Momoki, who was standing by an ambulance speaking with a paramedic. Officer Kobayashi assumed Momoki was either a passenger or the driver because he had noticed that someone else was being attended to in the ambulance. Officer Kobayashi remembered that Momoki appeared lethargic, "like in a zombie state, you're not totally aware of what's going on."

Officer Kobayashi related, "I asked [Momoki] if he knew who the driver of the vehicle was, and then he stated—I asked him if he was the driver, he stated yes[.]" After Momoki admitted that he was the driver of the van, Officer Kobayashi asked to see Momoki's driver's license. According to Officer Kobayashi, it took Momoki a while to take the license out of his wallet, and "he seemed

---

control of the operation of any vehicle while under the influence of any drug which impairs such person's ability to operate the vehicle in a careful and prudent manner. The term 'drug' as used in this section shall mean any controlled substance as defined and enumerated on schedules I through IV of chapter 329."

2. HRS § 291–12 (Supp.2001) provides that "[w]hoever operates any vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than thirty days, or both."

3. HRS § 701–109 (1993) provides:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

(a) One offense is included in the other, as defined in subsection (4) of this section; or

(b) One offense consists only of a conspiracy or solicitation to commit the other; or

(c) Inconsistent findings of fact are required to establish the commission of the offenses; or

(d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

(e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

lethargic, and when I was talking to him, his speech seemed slurred, and he was unsteady on his feet. . . . [And] he was kine'a nodding in and out." Officer Kobayashi did not smell alcohol on Momoki's breath. Officer Kobayashi noticed that Momoki asked the paramedics several times whether his insurance would cover the damage that had been done. But at no time did Momoki indicate to Officer Kobayashi that he was not the driver of the van.

Officer Kobayashi recalled that he obtained only basic information from Mark Kamei (Kamei), a presumed passenger in the van, because Kamei was being attended to by the paramedics and Officer Kobayashi did not want to get in their way. Officer Kobayashi's investigation did not turn up any bystander who had actually witnessed the accident. Officer Kobayashi did not find George Nueku, Jr. (Nueku), the third person allegedly in the van when the accident occurred, at the scene of the accident.

Officer Kobayashi summarized his conclusions about how the accident occurred:

> Mr. Momoki was driving north on Hawaii Kai Drive and apparently he swerved into the southbound lanes. His initial point of impact was the curb fronting 6602 Hawaii Kai Drive. Then he went into 6608 Hawaii Kai Drive knocking down two palm trees, then striking the vehicle at 6608, the first vehicle, then the second at 6608.

> Proceeded to the garage at 6608, then into the next residence at 6612 cracking the concrete sidewalk, then into the vehicle which is parked underneath the garage at 6612, colliding with that vehicle which caused the chain reaction into the next vehicle that was also in parked [ (sic) ] 6612, and then from this vehicle, colliding into the garage at 6612.

Officer Kobayashi added that he did not detect any skid marks at the scene of the accident that would indicate that the driver of the van had applied his brakes before impact.

Because of his observations of Momoki's demeanor, Officer Kobayashi requested that dispatch send a drug recognition expert (DRE) to Straub Emergency Clinic on King Street (Straub), where Momoki had been taken.

HPD officer Kenneth Nakamura (Officer Nakamura) testified that he was a DRE in training when he arrived at Straub at approximately 6:00 a.m., to "follow up on an accident investigation on a possible DUI." Officer Nakamura observed Momoki walking in the emergency room area, "taking short, choppy steps." "He was kine'a slow." Officer Nakamura also noticed that Momoki's eyes were red and bloodshot, and that Momoki's voice was slurred and raspy. Officer Nakamura remembered that Momoki appeared "a little uncoordinated": "Well, [he was taking] short, choppy steps, and his arm movements along with the leg appeared slightly disjointed like he was having difficulty walking." Officer Nakamura asked Momoki if he was injured and Momoki responded that his back was sore due to an "old back injury." Momoki elaborated that he was under the care of a physician and was taking soma, a central nervous system depressant, for his back.

At approximately 9:52 a.m., Officer Nakamura transported Momoki from Straub to the police station, where Momoki was read his *Miranda* rights. Officer Nakamura testified that Momoki did not rest or sleep while he was in police custody. Momoki told the police that he had last slept from 9:00 a.m. to 4:00 p.m. the previous day. While he was in custody at the police station, Momoki appeared to be "lethargic"; in other words, "very tired and moving slowly." He had difficulty concentrating and was "nodding off." He appeared to fall asleep at one point in his conversations with the police. Momoki made a statement at the police station. He stated that, prior to the accident, "he had taken half a tab of soma, two doses of vicoprophen [ (a "narcotic analgesic") ] along with his duragesic [ (sic; presumably, analgesic) ] patch." [4] Momoki also said that his vicopro-

---

4. At trial, it was stipulated that vicoprophen is a Schedule III controlled substance and soma is a Schedule IV controlled substance, and that "both of these drugs can impair a person's ability to operate a motor vehicle safely."

phen prescription was for only one dose at a time. Instead, he had been taking two.

At about 11:20 a.m., Momoki underwent a twelve-step, National Highway Traffic Safety Administration drug influence evaluation, which was administered by Officer Nakamura and supervised by a certified DRE instructor, Officer Roy Hayamoto (Officer Hayamoto). During the drug influence evaluation, Officer Nakamura observed that Momoki was swaying, unsteady and "losing his balance slightly." Momoki did not follow Officer Nakamura's instructions and appeared to fall asleep at one point during the evaluation. Momoki exhibited some of the typical effects of narcotics and depressants—"the raspy voice, on the nod, lethargic, not being able to take the information and process it in a timely manner." When asked about the effects vicoprophen and soma have on a person's ability to drive, Officer Hayamoto testified that vicoprophen "tend[s] to put a person on the nod, sleepy, kinda lethargic, slow to react. And soma is a [central nervous system] depressant similar to alcohol and it does a similar kind of impairment." Based on the results of the drug influence evaluation, Officer Nakamura concluded that Momoki was "under the influence of a central nervous system depressant and analgesic and that he was unable to operate a motor vehicle in a safe manner."

Nueku, Melinda Welch Momoki (Mrs. Momoki), Kamei, and Momoki testified for the defense. Nueku testified that he knew Momoki "through drugs. He's like a drug friend." Just before the accident, he, Kamei and Momoki had driven to Home Depot, which is open twenty-four hours a day, to purchase construction materials. Nueku remembered leaving Home Depot, but he did not have any recollection of the accident. All he recalled was waking up in the van after the accident and leaving the scene. "Yeah, I didn't hesitate but to split." Nueku said that both he and Momoki were "at the driver's seat" after the accident and that he "split out" first, leaving Momoki and Kamei in the van. He exited through the driver's door because of the van's position. Nueku testified that, "I was on somas, Valiums, ice and we were all on that. We all did all that

[(sic)] drugs." They used the drugs "[w]hile we were together, before we went to Home Depot, after we went to Home Depot, during we was [(sic)] in Home Depot." Nueku remembered being the driver of the van when they left Home Depot: "I left Home Depot driving. But I, I'm pretty sure—I can't say who was the driver [when the accident occurred] because there's no way I could have made it." Nueku surmised that at some point between Home Depot and the scene of the accident, Momoki became the driver of the van, but Nueku could not remember stopping anywhere after leaving Home Depot. Contrary to later testimony from Mrs. Momoki, Nueku maintained that he did not telephone either Momoki or Momoki's wife the night following the accident. On this point, Nueku testified as follows:

> Q. Now did at some point Mr. Momoki approach you in order to try to get you to take the rap for this?
>
> A. That's what—I been bribed a lotta things—
>
> Q. What type—
>
> A. —about this stupid case.
>
> Q. And what types of things did Mr. Momoki tell you about this case as far as what he wanted you to do?
>
> A. Take this rap.
>
> Q. And what'd you tell him?
>
> A. I not gonna take this rap.

Mrs. Momoki testified that on the afternoon after the accident, Nueku phoned their home and asked to speak to her husband. Mrs. Momoki called to Momoki—who was sleeping at the time—that he had a phone call and placed the phone next to his face. Because her husband did not appear to be listening, Mrs. Momoki picked up the phone and put it to her ear. She testified that Nueku "was inquiring if [Momoki] was all right and 'thank you', you know, 'thank you for covering for me. Thank you for saying you drove.' And he thought that he was talking to my husband." On cross-examination, Mrs. Momoki admitted that her husband was asleep the entire time and never initiated a conversation with Nueku with a greeting or otherwise. She was asked, "So it's your testimony that [Nueku] just decided

on his own just to go out and blurt all these things out." She responded, "Yes."

Kamei testified that he sat in the back of the van when they left Home Depot, but he could not recall who was driving the van at the time. He fell asleep shortly after they left Home Depot and did not wake up until the accident occurred. Kamei remembered that earlier that evening, Nueku had been driving the van, but at one point, "[Momoki] said [to Nueku], 'You ain't driving the car. I taking over from here.' That was before we went to Home Depot and ... [Momoki] took the van from there." Kamei surmised that Nueku's incapacity was caused by drug use. After the accident, Kamei crawled out of the van through a window or a door that was open. Momoki and Nueku had already gotten out of the van.

Momoki testified that he was sitting in the back seat of the van, Kamei was in the front passenger's seat, and Nueku was driving when they left Home Depot. Momoki fell asleep, and when he awoke they were driving past the Kahala Mall area. He fastened Kamei's seat belt and went back to sleep. The next thing he knew, he was on the floor in the back of the van. He remembered Nueku looking at him and telling him, "I'm leaving." Nueku gathered his things and left the car through the driver's side door. Momoki then went into the driver's seat and tried to wake Kamei.

On cross-examination, Momoki admitted that he took three tablets of vicoprophen and "half-a-tablet" of soma—but no ice—between 9:00 p.m. that night and the time of the accident. He denied any recollection of using drugs with Nueku, but later backed away from a categorical denial: "I would remember it. I mean, it was—it might have been a while, I mean, a long time ago, if any." He denied "partying" that night.

Momoki maintained that he told the police he was the driver of the van because he believed his insurance would not cover the accident if Nueku was driving the van. He later discovered that his insurance would cover anyone driving the van with permission, and hence, recanted his admission that he was driving the van at the time of the accident.

At the end of the bench trial, on January 25, 2001, the court found Momoki guilty of driving under the influence of drugs and inattention to driving. On February 20, 2001, Momoki filed a timely notice of this appeal.

## II.  Issues Presented.

On appeal, Momoki first contends there was insufficient evidence to support a finding that he was driving the vehicle when the accident occurred. In this respect, Momoki argues (1) that the court erroneously failed to specifically find that he was driving the vehicle at the time of the accident, and (2) that the record lacks substantial evidence to support such a finding.

Momoki also contends the court erred in convicting him of both inattention to driving and driving under the influence of drugs, because "these offenses were committed as an uninterrupted continuing course of conduct and Mr. Momoki cannot be convicted of both offenses[,]" pursuant to HRS § 701 109(1)(e). Opening Brief at 19.

## III.  Standards Of Review.

### A.  Sufficiency of the Evidence.

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable [a person] of reasonable caution to support a conclusion.

And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

*State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996) (citations, internal block quote format and some internal quotation marks omitted; brackets in the original).

It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part. As the trier of fact, the judge may draw all reasonable and legitimate inferences and deductions from the evidence, and the findings of the trial court will not be disturbed unless clearly erroneous. An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge.

*Id.* at 139, 913 P.2d at 65 (citations omitted).

B. *Conclusions of Law and Statutory Interpretation.*

■ Conclusions of law and matters of statutory interpretation are reviewed *de novo.* "The interpretation of a statute is reviewed de novo by this court. Conclusions of law are not binding upon this court and are subject to the right/wrong standard of review." *LeMay v. Leander,* 92 Hawai'i 614, 620, 994 P.2d 546, 552 (2000).

## IV. Discussion.

A. *There Was Substantial Evidence to Support the Court's Finding that Momoki Was Driving the Vehicle When the Accident Occurred.*

On appeal, Momoki limits his attack on the sufficiency of the evidence to the element of identity in both offenses.

■ Momoki first argues that the court erroneously failed to make a specific finding that he was driving the vehicle when the accident occurred. Upon a review of the record, we confirm that the court did not make a specific finding to that effect. Momoki did not request, however, that a specific finding be made. Accordingly, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 23(c) (2000), the court was required to make only a general finding of guilt. HRPP Rule 23(c) provides that

[i]n a case tried without a jury the court shall make a general finding and shall in addition, on request made at the time of the general finding, find such facts specially as are requested by the parties. Such special findings may be orally in open court or in writing at any time prior to sentence.

In an appeal from a conviction for cruelty to animals, we held:

Appellant complains that in the decision filed by the court, there is no finding that the animals in question were confined. However, no request for such a finding, pursuant to Rule 23(c), HRPP, appears in the record. That being so, the general finding of guilt in the decision was sufficient.

*State v. Bigelow,* 2 Haw.App. 654, 654, 638 P.2d 873, 874 (1982) (citation omitted).

Thus, although the court did not specifically find that Momoki was driving the vehicle at the time of the accident, its general findings of his guilt of driving under the influence of drugs and inattention to driving were sufficient. There was no error in this first respect.

■ Momoki next argues a lack of substantial evidence to support a finding that he was driving the vehicle at the time of the accident. " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable [a person] of reasonable caution to support a conclusion." *Eastman,* 81 Hawai'i at 135, 913 P.2d at 61 (citations, internal block quote format and some internal quotation marks omitted; brackets in the original).

Taking the evidence in the light most favorable to the State, as we must, *id.,* Momoki's admission to Officer Kobayashi, by itself, constituted substantial evidence that Momoki was driving the van at the time of the accident, even if Momoki retracted that admission at trial. *Cf. State v. Mitchell,* 94 Hawai'i 388, 401, 15 P.3d 314, 327 (App.2000)

(defendant, convicted of driving under the influence of alcohol and inattention to driving arising out of a single automobile accident, claimed at trial that a friend was driving but fled the scene after the accident; held, that defendant's admission to an investigating police officer at the scene that he was the driver, when taken in the light most favorable to the State, was sufficient). And as is evident from our review of the evidence adduced at trial, *supra*, Momoki's admission to Officer Kobayashi was not the only evidence that supported the court's finding that Momoki was the driver of the van.

As for contrary evidence, it was the prerogative of the court to discredit or give little weight to such evidence, *Eastman*, 81 Hawai'i at 139, 913 P.2d at 65, and the court in fact did so. In rendering its verdict, the court discounted the testimony of the primary defense witnesses. With respect to Mrs. Momoki, the court commented, "The testimony of [Mrs. Momoki] is incredible and the Court discredits and does not believe anything that she has testified to earlier." Similarly, the court found Momoki's testimony "self-serving and inconsistent." Further, "Mr. Momoki's statement of the facts make [ (sic) ] no sense in the scenario with the evidence given[.]" We will not pass upon the court's judgment in this respect. *Id.* ("An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge." (Citations omitted.)).

Accordingly, we conclude there was substantial evidence to support the court's finding that Momoki was driving the van at the time of the accident.

*B. HRS § 701–109(1)(e) Does Not Bar Momoki's Conviction of Both Driving Under the Influence of Drugs and Inattention To Driving.*

Momoki argues that the court erred in convicting him of both driving under the influence of drugs and inattention to driving, contending the convictions violated HRS § 701–109(1)(e). Although Momoki did not raise this issue below, there is still the matter of plain error. "We may recognize plain error when the error committed affects the substantial rights of the defendant." *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (citations and internal block quote format omitted). *See also* HRPP Rule 52(b) (2000) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). *Cf. State v. Alston*, 75 Haw. 517, 529–30, 865 P.2d 157, 164–65 (1994) (HRS § 701–109 error, not properly raised below, is plain error).

HRS § 701–109(1)(e) provides that

[w]hen the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if: . . . The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

(Enumeration omitted.)

At the outset, we question whether HRS § 701–109(1)(e) applies at all to the two offenses in this case. In order for the subsection to be implicated, the "same conduct" must establish an element of both offenses. HRS § 701–109(1). Such is not the case here. Momoki asserts that

[t]he impaired ability to operate a vehicle in a careful and prudent manner is no different than to operate a vehicle without due care. In both these offenses, then, an element of the offense is that the vehicle be driven without due care. Given this, if it is established that HRS §§ 291–7 and 291–12 are defined as a continuing course of conduct and that, in this case, Mr. Momoki's course of conduct was uninterrupted, he cannot be held convicted of both offenses.

Opening Brief at 31. This syllogism relies upon the questionable equation of impaired driving with driving without due care. Moreover, Momoki conveniently ignores the fact that it is not sufficient that the defendant's ability to drive be impaired; the defendant must also be "under the influence of

any drug[.]" HRS § 291–7. Further, Momoki forgets that the element of driving "without due care" is an alternative one to the element of driving "in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle, or other property[.]" HRS § 291–12.

At any rate, Momoki cannot satisfy the requirements of HRS § 701–109(1)(e), that "[t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses." When Momoki "operat[ed] or assum[ed] actual physical control of the operation of [his] vehicle while under the influence of any drug which impair[ed][his] ability to operate the vehicle in a careful and prudent manner[,]" HRS § 291–7, he committed the offense of driving under the influence of drugs. He also then completed the offense of driving under the influence of drugs. *Cf. State v. DeCenso*, 5 Haw.App. 127, 135, 681 P.2d 573, 580 (1984) (offense of kidnapping complete upon the act of restraint even though the restraint continued during the subsequent, intended sexual assaults); *State v. Correa*, 5 Haw.App. 644, 648–49, 706 P.2d 1321, 1324 (1985) (citing *DeCenso* for the same proposition). That Momoki's impaired driving thereafter continued through his commission of the offense of inattention to driving does not signal a violation of HRS § 701–109(1)(e):

> HRS § 701–109(1)(e) was intended to prohibit the State from dividing a crime, defined by statute as a continuing offense, into separate temporal or spatial units, and then charging a defendant with committing several counts of the same statutory offense, each count based on a separate temporal or spatial unit of the continuing offense. That did not occur here.

*State v. Caprio*, 85 Hawai'i 92, 104, 937 P.2d 933, 945 (App.1997). Nor did it occur here. Momoki was charged with only one offense of driving under the influence of drugs. *Cf. id.* (HRS § 701–109(1)(e) was not offended where defendant was charged with only one kidnapping offense in addition to the subsequent, intended sexual assaults).

Momoki also relies upon the test applicable to an HRS § 701–109(1)(e) inquiry set forth in *Alston*, 75 Haw. at 531, 865 P.2d at 165:

> Whether a course of conduct gives rise to more than one crime depends in part on the intent and objective of the defendant. The test to determine whether the defendant intended to commit more than one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. Where there is one intention, one general impulse, and one plan, there is but one offense. All factual issues involved in this determination must be decided by the trier of fact.

(Citations omitted.) In this respect, Momoki argues that

> if Mr. Momoki is found to have been the driver, the only general intent was to drive while under the influence of drugs which resulted in driving without due care. Hence, as the evidence supports an uninterrupted continuing course or conduct, it was error to convict Mr. Momoki of both the inattention to driving and driving under the influence of drugs.

Opening Brief at 32. Here again, appears the questionable equation of impaired driving and driving without due care. We do not accept the proposition that a general intent to engage in the former inevitably includes an intent to commit the latter. And we hesitate to ascribe to any defendant, no matter how egregious the case of driving under the influence of drugs, the subsumed intent to drive "without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property[.]" HRS § 291–12.

We conclude that in this case, HRS § 701–109(1)(e) was not offended by Momoki's convictions for driving under the influence of drugs and inattention to driving. There being no error, we do not have occasion to notice plain error in this respect.

### V. Conclusion.

Accordingly, we affirm the court's January 25, 2001 judgment.