185 P.3d 186

**STATE of Hawai'i, Respondent/Plaintiff–Appellee**

v.

**David H. BAYLY, Petitioner/Defendant–Appellant.**

No. 27954.

Supreme Court of Hawai'i.

May 29, 2008.

Sandra Kim (Jon N. Ikenaga, on the application and Teresa D. Morrison, on the brief), Deputy Public Defenders, for petitioner/defendant-appellant.

Renee Ishikawa–Delizo (Gerald K. Enriques, on the brief), Deputy Prosecuting Attorneys, for respondent/plaintiff-appellee.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ., with NAKAYAMA, J., Concurring in the Result Only.

Opinion of the Court by DUFFY, J.

Petitioner/Defendant–Appellant David H. Bayly seeks review of the October 11, 2007 judgment of the Intermediate Court of Appeals (ICA), which affirmed the district court of the second circuit's March 31, 2006 final judgment adjudging Bayly guilty of inattention to driving in violation of Hawai'i Revised Statutes (HRS) § 291–12 (Supp.2006).[1] We accepted Bayly's application for a writ of certiorari and oral argument was held on April 17, 2008.

Bayly asserts that the ICA gravely erred in affirming his conviction because there was insufficient evidence to prove that he operated a vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property.

Based on the following, we reverse the ICA's judgment.

1. The Honorable Rhonda Loo presided.

2. HRS § 291E–61, "Operating a vehicle under the influence of an intoxicant," provides, in relevant part:
    (a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:
    (1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty;
    (2) While under the influence of any drug that impairs the person's ability to operate the vehicle in a careful and prudent manner;

## I.  BACKGROUND

On December 6, 2005, Bayly was charged by complaint with Operating a Vehicle Under the Influence of an Intoxicant (OUI) in violation of HRS § 291E–61,[2] and inattention to driving, in violation of HRS § 291–12.[3] A bench trial was held on March 31, 2006.

### A.  Relevant Evidence Adduced at Trial

The following facts are drawn from the testimony of Officer Mark Hada and defendant Bayly at trial.

On October 1, 2005, at around 12:10 a.m., the Maui Police Department dispatch sent Wailuku patrol units to the parking lot of 1325 Lower Main Street, on the island of Maui. Officer Hada, who was assigned to the traffic department at that time, heard the dispatch and arrived at the scene at approximately 12:30 a.m. Officer Hada was told by other officers at the scene that the driver was suspected of being intoxicated.

Officer Hada described the parking lot at 1325 Lower Main Street as a flat, paved concrete parking lot. The parking lot was an elevated structure, raised about seven to eight feet above Lower Main Street, which is north of the lot, and separated by a concrete wall. Between the edge of the parking lot and the concrete wall is a grassy dirt area approximately two feet wide. The parking lot is raised about one foot to one foot and a half above the grassy dirt area. The parking spaces are angled so that vehicles on the side where Bayly's truck was parked face northwest. Officer Hada observed that the lighting in the area was "very adequate," and that weather conditions were clear.

(3) With .08 or more grams of alcohol per two hundred ten liters of breath; or
(4) With .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood.

3. HRS § 291–12 provides:

**Inattention to driving.** Whoever operates any vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than thirty days, or both.

Although Bayly was not in the vehicle at the time Officer Hada arrived, Hada testified that the front driver's side of Bayly's truck was hanging off of the concrete parking area and was onto the grassy area. Hada did not notice any damage to any property or to Bayly's truck.

According to Officer Hada, the truck was stuck in this position, and "there was not enough torque in the vehicle to actually reverse it out without having to call for a tow."

After approaching Bayly, Officer Hada observed that Bayly was disheveled, had a circular and side-to-side sway, had a strong odor of liquor, and had red, watery eyes, and slurred and mumbling speech. Hada also testified that Bayly was "very arrogant, very cocky, very uncooperative" in his interactions with the officer. Hada performed the horizontal and vertical gaze nystagmus field sobriety tests on Bayly, and based on his observations arrested Bayly for OUI.[4] Bayly was given a blood test at 2:15 a.m., and the parties stipulated that the test showed Bayly to have 0.068 grams of alcohol per 100 milliliters of blood.[5]

At trial, Officer Hada was shown a video of the parking lot at Lower Main Street. Upon viewing the video, Hada recalled that there was a yellow "bumpster [sic]" in the parking stalls where Bayly's truck had been parked, and that the driver's side tire of Bayly's vehicle was off the ledge. When asked whether the "other side was still on" the parking lot, Hada testified that he thought it was "partially off" and "believ[ed] it was hanging on the edge."

Bayly, testifying on his own behalf, stated that it was the front *passenger side* of his truck that went off the edge of the parking lot, while the left tire or driver's side was touching the bumper.[6] According to Bayly, he slowly entered the parking lot stall to ensure that his truck would touch the yellow bumper with the driver's side tire so that he would know when to stop. Bayly explained his car going off the edge as follows:

> Unfortunately that bumper isn't even attached to the concrete and it was put in a position to where my right side went off the embankment at the same time that I was technically trying to be, you know, touch that bumper with my tire.

Bayly added that he thought his car going off the edge "ha[d] to do with a bad parking stall," not "anything to do with impairment or judgment." With respect to the bumper, Bayly also stated that they are "completely loose," and that "there's holes in them where they're supposed to be mounted in the parking lot so that they're stationary, but they're not. They're loose."

On cross-examination, Bayly testified that he had been to the parking lot once before in the daytime, but that he was not aware of the "parking situation" on the side of the lot in which his car was parked on the night of the incident. Bayly admitted that he had consumed two beers that night.

Before ruling, the district court summarized the factual findings relevant to the inattention to driving charge based on the testimony and video evidence. With respect to the location of the vehicle, the court reiterated that Officer Hada testified that the front

4. Officer Hada testified that Bayly exhibited "six clues" during the horizontal nystagmus test, and exhibited vertical gaze nystagmus as well.

5. The prosecution also called Dr. Clifford Wong, an expert in toxicology, to testify regarding Bayly's likely level of intoxication at the time of the incident. Wong performed a retrograde extrapolation and testified that Bayly's blood-alcohol level would have been "definitely greater" than 0.08 at around midnight. The district court, however, found that because of uncertainty about the amount of time elapsed between the incident and the blood test, the testimony was insufficient to establish the earlier level.

Because the prosecution failed to meet its burden of proving the OUI charge, and has not

brought an appeal on the district court's ruling, evidence material only to the OUI charge is not at issue in this case. Although the fact that Bayly was under the influence of alcohol is "germane" to his inattention to driving charge, *see infra*, the specific and uncertain evidence regarding the precise blood-alcohol level is not important in this case.

6. In its summary disposition order (SDO), the ICA noted disagreement on this point, stating that "while the parties disagreed as to which tire went over the edge of the parking surface, the parties agree that one wheel did in fact go over the edge." ICA's SDO at 2.

end of the vehicle's driver's side tire was over the parking concrete area, and based on the video stated that there was a foot to a foot-and-a-half drop to the grassy dirt area below. The court reiterated Officer Hada's testimony that the bottom of Bayly's vehicle was touching the concrete area and that the vehicle's tire was hanging over the front. Regarding the yellow bumper, the court found that it was heavy but mobile with some force, and did not cover the whole length of the parking stall, such that one tire of a vehicle could pass to the side of the bumper and end up in the grassy dirt area.

### B. *Procedural History*

After a bench trial, the district court acquitted Bayly of the OUI charge, but found him guilty of inattention to driving. The court explained the basis for Bayly's conviction as follows:

> Count two deals with the inattention to driving and, again, the date and the defendant driving is not in contest.... *The Court needs to determine here whether or not Mr. Bayly did operate a vehicle without due care or in a manner as to cause a collision with injury or damage to a person, vehicle, or other property.*
>
> ....
>
> So this particular case, as far as the inattention to driving, *the Court does find that Mr. Bayly was operating his vehicle without due care.* I looked at the definitions of intentionally, knowingly and recklessly which would apply in this particular area and the Court finds either by the defendant's intentional actions, by his knowing actions or by his reckless actions, that he definitely was acting without due care in this particular manner.
>
> I do understand that driving is a multi-task kind of activity whereby you need your hands to drive, your feet to operate the gas pedal, your eyes to watch the road, and your brain to compute all of this.
>
> Obviously the application of force on a gas pedal combined with slowed reaction time due to the drinking, that Mr. Bayly at the very least admitted to two beers, not being able to stop in time, and ending up in this grassy area. *The Court does find*
>
> *definitely that he did operate his vehicle without due care.*
>
> *So the Court does find the defendant guilty of count two* and finds the defendant—the officer, Dr. Wong's testimony to be very credible in this particular area, and I'll find the defendant guilty of count two.

Bayly appealed, contending, as he does in his application, that there was insufficient evidence to support his conviction.

The ICA affirmed the judgment of the district court, entering its judgment on October 11, 2007. In its SDO, the ICA stated that "HRS § 291-12 specifies that the elements of inattention to driving are that a person: (1) operated a vehicle, (2) without due care or in a manner as to cause, (3) a collision with, or injury or damage to, as the case may be, any person, vehicle, or other property." ICA's SDO at 2. After reviewing each element, the court found that sufficient evidence existed for each. The first element, operation of a vehicle, was admitted. *Id.* The ICA found that there was sufficient evidence for the second element, operation without due care, based on the following:

> Officer Hada testified that the area was adequately lit. Further, while the parties disagreed as to which tire went over the edge of the parking surface, the parties agree that one wheel did in fact go over the edge. Bayly's truck ended up hanging off the edge of the parking lot, immobilized to the point where a tow truck was required to extricate it. Based on the evidence, the district court could have inferred that Bayly was not operating his vehicle with due care. Bayly admitted consuming two beers prior to parking the vehicle. Officer Hada testified that Bayly displayed signs of intoxication and was arrogant and cocky. Dr. Wong testified that Bayly's likely level of impairment at the time of the incident was a blood alcohol content in excess of .08 grams. Evidence of impairment is "germane to a charge of inattention to driving." *State v. Mitchell,* 94 Hawai'i 388, 401, 15 P.3d 314, 327 (App. 2000).

While Bayly is correct in his assertion that the mere occurrence of an accident is insufficient to sustain a conviction for Inattention to Driving, here we have the evidence of an accident, evidence of Bayly's intoxication, and the testimonies of Bayly, the arresting officer, and the intoxication expert. Viewed in the light most favorable to the State, this is enough to sustain the conviction. *Mitchell*, 94 Hawai'i at 401–02, 15 P.3d at 327–28. "We need not determine that the evidence shows negligence as a matter of law but merely that the evidence shows a possibility that negligence could be found as a matter of fact." *Id.* at 402, 15 P.3d at 328 (quoting *State v. Tamanaha*, 46 Haw. 245, 258, 377 P.2d 688, 696 (1962)).

ICA's SDO at 2–3. With respect to the third element, the ICA held that "the State adduced sufficient evidence of a collision between the bottom of Bayly's truck and the concrete parking lot surface to sustain Bayly's conviction," ICA's SDO at 3, citing this court's decision in *State v. Williams* for the proposition that "the vehicle must nevertheless 'collide' with another object." 114 Hawai'i 406, 410, 163 P.3d 1143, 1147 (2007).

Bayly filed an application for writ of certiorari on January 9, 2008. No response was filed and oral argument was held on April 17, 2008.

## II.  STANDARDS OF REVIEW

### A.  *Sufficiency of the Evidence/Judgment of Acquittal*

■ [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted).

The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. An appellate court employs the same standard of review.

*State v. Keawe*, 107 Hawai'i 1, 4, 108 P.3d 304, 307 (2005) (brackets omitted) (quoting *State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)).

### B.  *Statutory Interpretation*

■ Statutory interpretation is "a question of law reviewable *de novo*." *State v. Levi*, 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's statutory construction is guided by established rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

*Peterson v. Hawaii Elec. Light Co., Inc.*, 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

■ In the event of ambiguity in a statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." *Id.* (quoting HRS § 1–15(1) (1993)). Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law. *See* HRS § 1–15(2) (1993).

## III. *DISCUSSION*

### A. *The Elements of Inattention to Driving*

HRS § 291–12, "Inattention to Driving," provides as follows:

> Whoever operates any vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than thirty days, or both.

The ICA interpreted the offense to be composed of three parts: (1) operation of a vehicle, (2) without due care or in a manner as to cause, (3) a collision with, or injury or damage to, as the case may be, any person, vehicle or other property.

As presented at oral argument, the statute is susceptible to another interpretation, in which the disjunctive "or" provides for two alternative means of proving the offense (the "alternative means" theory).[7] The ambiguity in the statutory text thus concerns whether the "without due care" requirement is tied to the "collision"/"injury"/"damage" requirement (the "physical harm" element) or stands alone as a sufficient basis for charging the crime.

We are convinced, based on our reading of the statute in the context of the Hawai'i Penal Code, canons of statutory interpretation, and prior precedent, that the ICA's interpretation in the current case is a better construction of the statute.[8]

### 1. Problems With the "Alternative Means" Theory

#### a. *"without due care": absurd results and unconstitutional vagueness*

■ The "alternative means" theory creates problems of interpretation with regard to the first means by which the offense of inattention to driving could be committed—namely, to operate a vehicle "without due care." It is a basic rule of statutory interpretation that "[p]rovisions of a penal statute will be accorded a limited and reasonable interpretation ... in order to preserve its overall purpose and to avoid absurd results." *State v. Bates*, 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997). Under the first part of the "alternative means" theory, one may be prosecuted for slips in attention or other instances of "inattentiveness" while driving, such as momentarily taking one's eyes of the road, even when *no harm results*. Such possibilities show the potential for arguably absurd applications resulting from the "alternative means" interpretation.

■ The "alternative means" theory also raises potential constitutional concerns. "[W]here possible, we will read a penal statute in such a manner as to preserve its constitutionality. To accord a constitutional interpretation of a provision of broad or apparent unrestricted scope, courts will strive to focus the scope of the provision to a

---

7. This view was set forth by the ICA in an earlier published opinion that examined the inattention to driving statute to determine whether it punished the "same conduct" as a former statute for the offense of "Driving under the influence of drugs," HRS § 291–7(a) (1993) (repealed 2000). *State v. Momoki*, 98 Hawai'i 188, 46 P.3d 1 (App.2002). The ICA stated that "the element of driving 'without due care' is an alternative one to the element of driving 'in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle, or other property[.]' " *Id.* at 198, 46 P.3d at 8 (alteration in original).

Under the "alternative means" theory, the prosecution is required to prove two things: (1) operation by defendant of a vehicle, and (2a) "without due care" or (2b) "in a manner as to cause, a collision with, or injury or damage to, as the case may be, any person, vehicle or other property."

8. We differ slightly, however, in how we would parse the three parts of the statute. *See infra* Section III.A.3.

narrow and more restricted construction." *Id.* Interpreting the statute to apply to *any* driving that betokens, without more, a lack of "due care" raises potential problems of unconstitutional vagueness, by granting indeterminate discretion to arresting officers to apply the statute. This court has explained that

> [d]ue process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudicating guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

*Id.* Vagueness is measured by the following standard:

> [A] criminal statute is void for vagueness unless it: 1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly, and 2) provides explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.

*Id.* Because it fails to specify an explicit standard, the mere command that one not drive "without due care"—regardless of any physical harm caused by such driving—raises potential problems of arbitrary and discriminatory enforcement. The potential of the "alternative means" theory to violate important penal and constitutional principles suggests that a more sensible interpretation would be preferred.

b. *Hawai'i caselaw has not generally supported the "alternative means" theory.*

Past decisions also provide implicit disapproval of the "alternative means" theory in the context of inattention to driving. In *State v. Mitchell,* the ICA upheld a conviction for inattention to driving when the defendant's vehicle "plowed into the rear" of a car in front of it, which sustained "rear-end damage." 94 Hawai'i 388, 401, 15 P.3d 314, 327 (App.2000). In explaining its opinion, the ICA stated that

> Mitchell contends, and *we agree,* that mere occurrence of an accident without more, is insufficient to sustain a conviction for inattention to driving. Admittedly, the record does not suffer from a plethora of evidence as to the physical circumstances of the accident. However, as detailed above, there is more in this record than the mere occurrence of an accident.

*Id.* (citation omitted). By rejecting the possibility that a mere accident could lead to liability, the ICA also rejected, impliedly and *sub silentio,* the non-culpable alternative of the "alternative means" theory of the statute.[9] *But see Momoki,* 98 Hawai'i 188, 46 P.3d 1 (endorsing the "alternative means" theory, discussed *supra* note 7).

Moreover, in all prior published decisions concerning HRS § 291–12, the physical harm element has been present, usually in the form of a collision. *See State v. Reyes,* 57 Haw. 533, 533, 560 P.2d 114, 115 (1977) (defendant, "intending to make a left turn from a two-lane highway into a gravel road, moved the vehicle he was driving from the right to the left lane, where it was struck from behind by a vehicle which was overtaking a line of three cars"); *Mitchell,* 94 Hawai'i 388, 15 P.3d 314 (rear-end collision); *State v. Lee,* 55 Haw. 505, 523 P.2d 315 (1974) (clarifying that

---

9. In fact, as discussed *infra,* it would violate the Hawai'i Penal Code to allow conviction for inattention to driving based on non-culpable conduct, because every element of a penal offense must carry a state of mind of at least "recklessness" unless a legislative purpose to impose absolute liability is strikingly clear. *See State v. Rushing,* 62 Haw. 102, 105, 612 P.2d 103, 106 (1980) ("[T]he mere absence of a specification of the requisite state of mind does not provide a sufficient basis from which to override the gener-al policy of the Hawaii Penal Code that absolute or strict liability in the penal law is indefensible if conviction results in the possibility of imprisonment and condemnation. That the legislative purpose to impose absolute liability should not be discerned lightly by the courts seems very clear." (Citations omitted.)). When an offense fails to specify the mental state required, the default mental states of "intentionally," "knowingly," and "recklessly" are applied. *See* HRS 702–204; *infra* Section III.A.2.

the inattention to driving statute applies to activity on private roads and accordingly reversing trial court's dismissal of two cases; in both, the charge was that the defendant's vehicle had collided with another vehicle).

### 2. A Unitary Approach to HRS § 291-12

A better starting point is to analyze the elements of the inattention to driving offense according to the framework of the Hawai'i Penal Code. *See* HRS § 702-205 ("Elements of an offense," include "conduct," "attendant circumstances," and "results of conduct").[10] HRS §§ 701-114(1) and 701-114(2) (1993) require proof beyond a reasonable doubt of "[e]ach element of the offense," as well as "[t]he state of mind required to establish each element of the offense." *See also* HRS § 702-204 ("[A] person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, *with respect to each element of the offense.*" (Emphasis added.)).

The inattention to driving statute, HRS § 291-12, is comprised, *inter alia*, of a conduct element and a result of conduct element. First, the statute includes a conduct element. The conduct element, itself composed of several parts, includes operation of a vehicle,[11] and the phrase "without due care or in a manner." The statute concludes with a result element, "as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property...." HRS § 291-12.

▮▮ Two aspects of the phrase "without due care or in a manner," which modifies the type of driving punishable by the statute, should be noted. First, the phrase refers to the manner in which a vehicle is operated, or the nature of that operation. It thus describes conduct. In *State v. Reyes*, this court, apparently relying only on the "without due care" verbiage of the statute, read the phrase to suggest a state of mind requirement, and concluded that inattention to driving "requires only a showing of negligence in the operation of [the] vehicle...." 57 Haw. 533, 534-35, 560 P.2d 114, 115-16 (1977). However, the Hawai'i Penal Code sets a higher standard for criminal negligence than the mere lack of "due care." For example, HRS § 702-206(4)(a) (1993) specifies that "[a] person acts negligently with respect to his conduct when he should be aware of a *substantial and unjustifiable risk* taken that the person's conduct is of the specified nature." (Emphasis added.) HRS § 702-206(4)(d) makes clear that "[a] risk is substantial and unjustifiable within the meaning of this subsection if the person's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a *gross deviation from the standard of care that a law-abiding person would observe in the same situation.*" (Emphasis added.).[12] "Gross de-

---

10. Although HRS § 291-12 was first enacted in 1971, 1971 Haw. Sess. L. Act 150, § 2, at 347, prior to the adoption of the Hawai'i Penal Code, 1972 Haw. Sess. L. Act 9, § 1, at 32-142, the Code nevertheless applies to it. HRS § 701-102(3) (1993), entitled, "All offenses defined by statute; applicability to offenses committed after the effective date," states, "The provisions of chapters 701 through 706 of the Code are applicable to offenses defined by other statutes, unless the Code otherwise provides."

11. That one is operating a *vehicle*, rather than something else that can be "operated" (e.g. a bicycle), could also be analyzed as an attendant circumstance element of the crime. However, because there is no dispute that Bayly operated a vehicle, it is unnecessary to engage in this analysis.

12. HRS § 702-206(4), defining "Negligently," provides in full:

(a) A person acts negligently with respect to his conduct when he should be aware of a substantial and unjustifiable risk taken that the person's conduct is of the specified nature.

(b) A person acts negligently with respect to attendant circumstances when he should be aware of a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts negligently with respect to a result of his conduct when he should be aware of a substantial and unjustifiable risk that his conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this subsection if the person's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a law-abiding person would observe in the same situation.

viation" from a law-abiding person's standard of care denotes a higher level of culpability than a mere deviation from the "due care" standard. To the extent that the ."without due care" designation fails to map the state of mind requirement described as "negligently" in the Hawai'i Penal Code, we believe that no state of mind is clearly specified by the statute. Therefore, the default states of mind of "intentionally," "knowingly," or "recklessly," would be required as to each element of the statute. *See* HRS § 702–204 ("When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly."). Accordingly, we overrule *Reyes* on this point.

■ The second important aspect of the phrase "without due care or in a manner" follows naturally from the above analysis, namely, that the phrase should be understood as a unitary expression of the type of driving punishable by the statute, rather than a construction establishing alternative means to prove the offense. Under this reading, the phrase "in a manner as to cause" is best understood as an extension of the "without due care" language, linking the conduct and result elements. In other words, both phrases describe the manner of operation of the vehicle—which we have interpreted as requiring a mental state of at least recklessness—and link that manner to the result element of causing a collision, injury, or property damage. In this case, the term "or" is best read conjunctively. *See* HRS § 1–18 (1993); *In re City & County of Honolulu Corp. Counsel*, 54 Haw. 356, 374, 507 P.2d 169, 178 (1973) ("We are of the opinion that the disjunctive 'or' in the context as used in [the statute] actually imparts the meaning of the conjunctive 'and'. The sense of a word which harmonizes best with the whole context of the statute and promotes in the fullest manner the apparent policy and

objects of the legislature must be adopted."). Because under the Hawai'i Penal Code each of the two expressions, "without due care" and "in a manner [as to cause]," connote at least a reckless state of mind with respect to the conduct of operating a vehicle, interpreting them together best harmonizes the phrase with the statute as a whole.

This interpretation avoids the problems outlined above—potential absurdity and unconstitutional vagueness—while fulfilling the dictate that "[p]rovisions of a penal statute will be accorded a limited and reasonable interpretation ... in order to preserve its overall purpose," *Bates*, 84 Hawai'i at 220, 933 P.2d at 57. It also represents a sensible approach to a statute that is not a model of clarity, and is consistent with the manner in which the statute has been applied in our caselaw.

Based on the foregoing, we hereby reject the "alternative means" theory of HRS § 291–12 expressed by the ICA in *Momoki* and require that the conduct and result elements all be proven, along with the requisite state of mind, to convict under the statute.

### 3. Applying This Construction of HRS § 291–12 to the Instant Case

Therefore, in order to convict under HRS § 291–12, the prosecution had the burden of proving beyond a reasonable doubt that Bayly (1) operated a vehicle "without due care or in a manner," (conduct) (2) "as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property" (result of conduct), HRS § 291–12, and that he did so (3) intentionally, knowingly, or recklessly, HRS § 702–204.[13]

Bayly asserts that the ICA gravely erred in affirming his conviction of inattention to driving, because there was insufficient evidence to prove that Bayly operated a vehicle without due care or in a manner as to cause a

---

13. We acknowledge that "reckless driving" is also punishable by another statute. *See* HRS § 291–2 (2007) ("Whoever operates any vehicle or rides any animal recklessly in disregard of the safety of persons or property is guilty of reckless driving of vehicle or reckless riding of an animal, as appropriate, and shall be fined not more than $1,000 or imprisoned not more than thirty days,

or both."). Indeed, this fact supports the idea that the legislature originally intended the "physical harm" component in the inattention to driving statute to be a mandatory part of the offense, so as to distinguish driving "without due care" from its close relative, "recklessly in disregard of the safety of persons or property." *Compare* HRS § 291–12 *with* HRS § 291–2.

collision with, or injury or damage to, as the case may be, any person, vehicle, or other property. Because Bayly does not dispute that he operated the truck on the night in question, we restrict our analysis to the evidence of any collision, injury, or damage caused by Bayly's driving.

B. *The ICA Gravely Erred When it Concluded that there Was Sufficient Evidence to Establish a "Collision With ... Other Property."*

### 1. The Collision Requirement and Bayly's Argument

Under the result element of HRS § 291–12, the prosecution must prove that there was a collision, that a person was injured, or that property was damaged. As no evidence of property damage or personal injury was presented at trial, this case hinges on the evidence of a "collision."

In his application, Bayly argues that the prosecution failed to adduce evidence that Bayly collided with any person, vehicle, or other property. Bayly does not deny that his truck "came into contact with the concrete parking lot surface." Rather, Bayly argues that "this incidental contact [did not] constitute[ ] a 'collision.' "

Notably, the district court made no findings with respect to this element of the inattention to driving charge.[14] The ICA, in its SDO, treated the issue as follows:

> As to the third element, the State adduced sufficient evidence of a collision between the bottom of Bayly's truck and the concrete parking lot surface to sustain Bayly's conviction. *State v. Williams*, 114 Hawai'i 406, 410, 163 P.3d 1143, 1147 (2007) ("the vehicle must nevertheless 'collide' with another object").

ICA's SDO at 3.

In its brief to the ICA, the prosecution argued that Bayly's "operation of his truck

resulted in a collision between his vehicle and the surface of the parking lot," based on Officer Hada's testimony that the bottom frame of Bayly's truck was touching the concrete parking lot surface. According to the prosecution, it could reasonably be inferred "that the bottom frame of [Bayly's] truck collided with the parking lot surface when it went over the edge of the parking lot." The prosecution also noted that "the bottom frame of a truck is not a portion of the vehicle that normally comes into contact with the ground, as the truck's tires usually keep the body above ground level."

### 2. The Meaning of "Collision"

Because the evidence adduced regarding the alleged "collision" is not in dispute, the question whether a "collision" occurred is a pure question of law. Specifically, at issue in this case is whether contact between the bottom of a truck and the surface on which the vehicle sits—be it a road or a parking lot—constitutes a "collision." More broadly, the basic issue is whether a "collision" occurs when some part of a vehicle contacts only the road itself.

In order to answer this question, this court must heed the "plain and obvious meaning" of the statute in order to give effect to the intention of the legislature. *See Peterson*, 85 Hawai'i at 327, 944 P.2d at 1270. If the statute is ambiguous, and no such plain or obvious meaning emerges, it is permissible for the court to resort to context and extrinsic aids. *See* HRS §§ 1–15(1) and 1–15(2).

We focus on the critical phrase: "collision with ... any person, vehicle or other property." HRS § 291–12. The term "collision" is not defined in HRS chapter 291. As a general matter, "[t]he words of a law are generally to be understood in their most known and usual signification, without attending so

---

14. In its oral ruling, the court focused only on the "due care" element of the statute, discussing the various pieces of evidence in favor of that finding. The absence of any consideration of the "collision"/"injury"/"damage" element is clear from the manner in which the court concluded its discussion:

> Obviously the application of force on a gas pedal combined with slowed reaction time due

to the drinking, that Mr. Bayly at the very least admitted to two beers, not being able to stop in time, and ending up in this grassy area. *The Court does find definitely that he did operate his vehicle without due care.*

> So the Court does find the defendant guilty of count two ....

much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning." HRS § 1–14 (1993). To determine what meaning to attach to the term "collision," we first review relevant caselaw on the meaning of "collision" in other criminal statutes as well as in the context of automobile insurance policies that cover "collisions."

### a. *caselaw definitions of "collision"*

This court recently examined, although in a different context, a similar "collision" requirement in HRS § 291E–21 (Supp.2004), which mandates that police officers take a blood sample to determine intoxication in the event of a "collision" where the officer has probable cause to believe a person involved committed an enumerated traffic offense. *State v. Williams,* 114 Hawai'i 406, 163 P.3d 1143 (2007). In *Williams,* a police officer arrived at an accident scene to find a motorcycle on the side of the roadway, and a male party about fifteen feet away, close to the shoulder of the roadway. *Id.* at 407, 163 P.3d at 1144. The male was bleeding from a cut on his lip and the officer detected an odor of alcohol from him. *Id.* At trial, the officer testified that he did not find any debris on the ground, skid marks, or "anything like that," and concluded that the party fell from his motorcycle to the ground. *Id.* at 408, 163 P.3d at 1145. The officer later ordered that a blood draw be taken of the defendant, without the latter's consent.

The defendant in *Williams* had asserted that the police officer was not authorized to order a blood draw under HRS § 291E–21, because evidence of a "collision" was lacking. *Id.* at 410, 163 P.3d at 1147. In order to assess whether the evidence was sufficient to constitute a "collision," this court consulted the Webster's dictionary definition:

> "Collision" is defined as "the action or an instance of colliding, violent encounter, or forceful striking together typically by accident and so as to harm or impede." *Webster's Third New Int'l Dictionary* 446 (1993).

*Williams,* 114 Hawai'i at 410, 163 P.3d at 1147. The court further stated that "although single-vehicle accidents may qualify as collisions, in such a case the vehicle must nevertheless 'collide' with another object." *Id.* (citing *State v. Entrekin,* 98 Hawai'i 221, 223, 47 P.3d 336, 338 (2002), in which a automobile crossed the center divide of a highway and "collided with a dirt embankment.").[15]

Noting the absence of any evidence of damage to the motorcycle or of the motorcycle's position with respect to the road, the lack of physical evidence indicating a collision, and the officer's testimony concluding that the defendant "fell off the bike," this court concluded that the evidence was insufficient to establish a collision. *Id.*

*Williams* did not directly address the question whether the motorcycle's position at the side of the road indicated that it "collided" with the road when the defendant apparently fell off the bike. However, by finding the evidence of collision insufficient, we implicitly rejected the notion that a vehicle striking the roadside qualifies as a "collision."

A more direct consideration of the meaning of "collision" can be found in an older Hawai'i case, *Alexander v. Home Insurance Co.,* 27 Haw. 326 (Terr.1923). The sole question in *Alexander* was "the liability of the insurer under the 'collision clause' of its policy for damages occasioned an automobile insured by it which accidently capsized or tipped over on to the road over which it was being operated." *Id.* at 326–27. The insured car capsized when the driver applied the brakes suddenly to avoid a collision with a horse that had dashed into the road, coming into "violent contact with the ground at the side of the road sustaining damage to its body, machinery, and equipment." *Id.* at 327. The insured, arguing that the accident was covered under the "accidental collision" policy of its contract, asserted that the violent contact with the road was a " 'collision' between the automobile and the side of the road within the definition of that term as employed in the policy." *Id.*

---

**15.** "Collide" is defined as "to become impelled into violent contact"; "to strike or dash together in collision typically by accident with a degree of force and shock *and with solid rather than glancing or sideswiping impact." Webster's Third, supra* at 445 (emphasis added).

The *Alexander* court ultimately held that the accident did not involve a collision. *Id.* at 332. To reach this conclusion, the court relied upon the generally accepted meaning of the word, rather than what it termed the "technical lexicographical definition," under which the accident might be classified as the "striking together of two bodies" and thus a "collision." *Id.* at 328. The court explained the popular meaning of "collision" in the following passage:

One describing the accident in the instant case would not refer to it as a "collision." The term "capsize" or "tip-over" as employed in the submission would be more reasonably descriptive of the accident. Were one to refer to an automobile as being "in collision" without giving further details, the mind of the auditor would naturally visualize *an automobile coming in contact with some other vehicle or some perpendicular object obstructing the course of its progress.* This thought is best illustrated, perhaps by the not uncommon accident to a pedestrian slipping and falling to the pavement. One would not say that he collided with the pavement. A fall is not spoken of as a collision.

*Id.* at 328–29 (emphasis added). The court also quoted the Wisconsin Supreme Court's similar rejection of a hypertechnical meaning of "collision":

"Upon its face this appears to be good logic, but the conclusion is neither convincing nor satisfying. One instinctively withholds assent to the result. The reason is that it makes a novel and unusual use and application of the word 'collision'. We do not speak of falling bodies as colliding with the earth. In common parlance the apple falls to the ground; it does not collide with the earth. So with all falling bodies. We speak of the descent as a fall, not a collision. In popular understanding a collision does not result, we think, from the force of gravity alone. Such an application of the term lacks the support of 'widespread and frequent usage'."

*Id.* at 331 (quoting *Bell v. American Ins. Co.,* 173 Wis. 533, 181 N.W. 733 (1921)).

Courts in other jurisdictions have also examined whether similar accidents were "collisions" in the context of insurance coverage.[16] A notable case representing a view opposite to that of *Alexander* is *Payne v. Western Casualty & Surety Co.,* 379 S.W.2d 209 (Mo. Ct.App.1964). In *Payne,* the insured's tractor and trailer slipped and went onto the soft shoulder of a highway, causing the tractor and trailer wheels to be submerged in soft soil and materially damaging the trailer and its load. *Id.* at 210. The court was required to determine whether such contact with the soft shoulder of the highway was a "collision of the automobile with another object" under the insurance policy. *Id.*

With regard to "collision," the court set out the following reasoning:

Generally speaking, the determination of whether there has been a 'collision' within the intent and meaning of the policy involves (1) whether there was an object which was struck, and (2) the manner of the striking. As noted by the authorities, there is an irreconcilable conflict in the efforts of the various courts in construing the meaning and application of the word 'collision' as it appears in insurance policy clauses of the type before us. Some courts construe the word narrowly by limiting its meaning to a so-called 'popular conception', *i.e. the striking with force some foreign or perpendicular object, and thereby exclude contact with the ground of the highway or shoulder.* The majority of the courts, often noting there is no proof that the word 'collision' has some commonly known and generally recognized restrictive meaning in insurance contracts take the viewpoint that the word 'collision' ... should be defined broadly and in its dictionary 'striking against', thus including every contact with any part of the highway.

*Id.* at 211.

Adopting a broad definition of "collision," the Missouri appellate court next addressed

16. Bayly cites a Louisiana case, *Brown v. Union Indemnity Co.,* 159 La. 641, 105 So. 918 (La. 1925), that is similar to *Alexander* both factually and in terms of the court's reasoning. In *Brown,* the Supreme Court of Louisiana determined that

a there was no collision when the plaintiff-insured, to avoid hitting an on-coming car, made a sharp turn that resulted in the car tipping over and coming into "violent contact with the surface of the road. *Id.*

the holdings of other courts with respect to impacts between motor vehicles and the roads they travel on:

> Courts which have ascribed to a dictionary or broad definition of the word 'collision' have held that an impact between a motor vehicle and obstacles on the road such as rocks, barricades, holes, excavations, and washouts are collisions with another object within the policy provisions. *On the other hand it has been held that contact of an automobile with the road itself, as where the road surface is irregular or has rough spots, does not constitute a collision with an object within the meaning of the policy, and this sometimes because of a general feeling that the policy as 'popularly understood' was not intended to furnish coverage for that type of accident and sometimes because it was felt that since the automobile wheels were already in constant contact with the highway surface and in a sense striking it as the wheels turned around the collision clause was intended to refer to some other object than the road upon which the automobile is being driven.*
>
> However, it is obvious from a study of the decisions that where the impact or striking occurs other than on the road proper, *i.e.* not on that part constructed, intended and used for travel thereon, the tendency is more liberal toward finding coverage upon impact between the vehicle and another object, including those formed by the terrain.

*Id.* at 212 (emphasis added). In applying these principles to the stipulated incident, the Missouri appellate court ultimately concluded that a "collision" within the meaning of the insurance contract had taken place. In reaching this result, the court did not conclude that a mere striking of the road was sufficient; rather, it described the incident as the "sudden contact of a moving body, the vehicle, with an obstruction in its line of motion," which it characterized as a "solid bank of earth ... not part of the regular roadway intended and used for travel," as well as "the somewhat perpendicular dirt." *Id.* at 212–13.

### b. the meaning of "collision" in HRS § 291–12

■ Based on *Williams* and *Alexander*, as well as the mandate of HRS § 1–14 that "[t]he words of a law ... be understood in their most known and usual signification," we believe that the term "collision" in HRS § 291–12 should be understood in a colloquial, rather than a technical sense. Under such a construction, "collision" generally refers to "an automobile coming in contact with some other vehicle or some perpendicular object obstructing the course of its progress." *Alexander,* 27 Haw. at 328.

Basic canons of statutory construction provide additional support for the adoption of this narrower interpretation of "collision." In the *Payne* case, although the Missouri appellate court adopted a broader interpretation of "collision," which covered the vehicle's running off of the road onto soft soil, the court made clear that its interpretation was limited to the context of insurance contracts. Indeed, the court explicitly invoked "the fundamental principle of construction of insurance contracts that where reasonable to do so such contracts are to be construed in favor of the insured so as to provide coverage and against the insurers who drafted the instrument." 379 S.W.2d at 211.[17] The broader interpretation of "collision" was consistent with this principle.

---

17. This principle has been recognized in Hawai'i, *see Dairy Road Partners v. Island Ins. Co.,* 92 Hawai'i 398, 411–12, 992 P.2d 93, 106–07 (2000) ("[W]e have long subscribed to the principle that [insurance contracts] must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer." (Quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 271, 948 P.2d 1103, 1112 (1997).)), and has been applied in numerous cases construing collision insurance policies. *See* Annotation, *Recovery under automobile property damage policy expressly including or excluding collision damage, where vehicle strikes embankment, abutment, roadbed, or other part of highway,* 23 A.L.R.2d 389, 395 (1952)("Thus, in accordance with the fundamental principle of construction of insurance contracts that such contracts are to be construed in favor of the insured, it has been held in a number of cases that the word 'collision,' as used in provisions insuring a motor vehicle against collision, is to be construed more strongly against the insurer.").

In contrast to *Payne*, the instant case arises under the penal law, where the basic canons of statutory construction counsel in favor of a less expansive definition. This court has stated that, "[w]here a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity. Under the rule of lenity, the statute must be strictly construed against the government and in favor of the accused." *State v. Shimabukuro*, 100 Hawai'i 324, 327, 60 P.3d 274, 277 (2002) (citations omitted). This rule makes it more appropriate to adopt a less expansive meaning of the term "collision."

Therefore, for the reasons stated above, the term "collision" in HRS § 291–12 should carry its common meaning, and not the more expansive technical definitions used in some contexts.

### 3. Applying this Interpretation of "Collision" to the Evidence in this Case

 The prosecution asserts that there was a collision in this case based on the contact of the bottom of Bayly's truck—which normally does not touch the road surface—with the surface of the parking lot when one side of the truck went over the parking lot edge. The prosecution has neither adduced evidence nor proffered any theory about the severity of impact the truck bottom had with the road surface. No evidence of damage to the truck bottom appears in the record.

Under these circumstances, we cannot say that Bayly "operate[d] any vehicle . . . in a manner as to cause a collision with . . . other property." HRS § 291–12. The prosecution's interpretation strains credulity in the face of the commonly-understood concept of "collision." As the court recognized in the similar circumstances of the *Alexander* case, "[o]ne instinctively withholds assent to the result." 27 Haw. at 331. Unlike a typical "collision," there was no contact with a "perpendicular object obstructing the course of [the vehicle's] progress." *Id.* at 328. As Bayly notes, the bottom of a vehicle comes into contact with the road surface in other circumstances that are not commonly understood as "collisions," such as when a car "bottoms out" in a pothole or over a speed bump.

In short, Bayly's vehicle was not involved in a collision as a matter of law. Without satisfying the result of conduct element, Bayly cannot be convicted of inattention to driving. As such, it is unnecessary to reach Bayly's argument that the ICA erred in upholding the circuit court's determination the he operated a vehicle without due care.

### IV. CONCLUSION

Accordingly, we reverse the ICA's judgment and the district court's March 31, 2006 final judgment.

NAKAYAMA, J., concurring.

I concur in the result only.

