231 P.3d 968

STATE of Hawai‘i, Respondent/Plaintiff–Appellee,

v.

JING HUA XIAO, Petitioner/Defendant–Appellant.

No. 28370.

Supreme Court of Hawai‘i.

May 25, 2010.

William A. Harrison (of Harrison & Matsuoka), Honolulu, for petitioner/defendant-appellant.

Anne K. Clarkin, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, DUFFY, and RECKTENWALD, JJ.; ACOBA, J., concurring separately.

Opinion of the Court by MOON, C.J.

On March 29, 2010, this court accepted petitioner/ defendant-appellant Jing Hua Xiao's application for a writ of certiorari to review the Intermediate Court of Appeals' (ICA) December 3, 2009 judgment on appeal, entered pursuant to its November 13, 2009 summary disposition order. Therein, the ICA affirmed the District Court of the First Circuit's[1] December 12, 2006 judgment, convicting Xiao of prostitution in violation of Hawai'i Revised Statutes (HRS) § 712–1200(1) (1993 and Supp.2008).[2]

Briefly stated, pursuant to a police undercover investigation for possible prostitution activities at Club Sara Lee in Honolulu, Xiao was charged with prostitution based upon "slow dancing" with an undercover police officer, who had bought her several drinks, during which she engaged in sexual conduct, i.e., rubbing her body and breasts up against the officer's body and groin area. Following a bench trial, Xiao was convicted, and she appealed. On direct appeal before the ICA, Xiao argued that there was insufficient evidence to support her conviction. The ICA disagreed and affirmed her conviction.

On application, Xiao argues that the ICA erred in concluding that there was sufficient evidence that she engaged in sexual conduct for a fee. More specifically, she argues, inter alia, that "there [wa]s absolutely no evidence adduced that the drink[s] she received constituted a fee" and any sexual conduct that went on between herself and Officer Wagner was "merely gratuitous."[3]

Based on the discussion below, we hold that there was insufficient evidence to convict Xiao under HRS § 712–1200(1). We, therefore, vacate the ICA's judgment on appeal and reverse Xiao's conviction.

## I. BACKGROUND

On October 8, 2006, Xiao was arrested for prostitution based on an encounter between Xiao and Honolulu Police Department (HPD) undercover officer Joel Wagner (Officer Wagner) at Club Sara Lee on July 24, 2006.[4] On December 12, 2006, Xiao was orally charged as follows:

> You are charged that on or about July 24th, 2006, in the City and County of Honolulu, State of Hawai'i, you did engage in or agree to offer to engage in sexual con-

---

1. The Honorable Edwin C. Nacino presided.

2. HRS § 712–1200 provides:
 **Prostitution.** (1) A person commits the offense of prostitution if the person *engages in, or agrees or offers to engage in, sexual conduct with another person for a fee.*
 (2) As used in subsection (1), "sexual conduct" means
 "sexual penetration," "deviate sexual intercourse," or "sexual contact," as those terms are defined in [HRS § ] 707–700 [ (Supp. 2006) ].
 (Bold emphasis in original.) (Underscored emphasis added.)

3. Xiao also contends that "there [wa]s absolutely no evidence that would confirm that ... Xiao received monetary compensation *from anyone for* the purchase of the drink" and that the ICA's

decision in this case is inconsistent with its decision in *State v. Schneider*, 120 Hawai'i 418, 209 P.3d 195 (App. June 26, 2009)(SDO). Inasmuch as we vacate the judgment of the ICA and reverse Xiao's conviction based on her first point of error, we do not address her remaining contentions.

4. There is no indication in the record as to why Xiao's arrest occurred two and a half months after the encounter between Xiao and Wagner at Club Sara Lee. As previously indicated, Wagner's presence at the club was part of an undercover investigation into possible prostitution activities in the club. Thus, Xiao's arrest was presumably delayed because of the ongoing undercover investigation.

duct with another person for a fee, thereby committing the offense of [p]rostitution in violation of [HRS § ] 712–1200(1)[.]

Xiao pleaded not guilty to the charge.

### A. *Non–Jury Trial*

Xiao's bench trial commenced on December 12, 2006 and lasted one day. The sole evidence presented by respondent/ plaintiff-appellee State of Hawai'i (the prosecution) was the testimony of Officer Wagner.

On direct examination, Officer Wagner testified that, on the evening of July 24, 2006, he was working undercover with the morals detail of the narcotics-vice division of the HPD, investigating possible prostitution activity at Club Sara Lee, a bar in Honolulu. According to Officer Wagner, Xiao entered a karaoke room at the bar that Officer Wagner shared with another HPD officer and another female. He testified that he knew Xiao from other nights that he had visited Club Sara Lee. As to the events that took place in the karaoke room, Officer Wagner testified as follows:

Q. [By the prosecution] [T]ell us what happened[.]

A. [By Officer Wagner] [Xiao] came to me[,] and we greeted each other. We sat down, she asked if she could have a drink. I asked if there were any other types of drinks than [the] twenty-dollar type that I had bought her on previous occasions, and she said yes, there are other types.

Q. Okay. So, you asked her if there are any other types of drinks. Okay, so then what happened.

A. She said ... there's a forty-dollar type of drink as well.

Q. So then what did you say?

A. I said go ... and get yourself a forty-dollar drink. I then gave her some of the pre-recorded money that we had, that I had been issued.

Q. Did you give her a full forty dollars?

A. Yes.

Q. Okay. And did she actually go get you the drink herself?

A. She went and got her ———

Q. I'm sorry, that drink for herself?

A. Yeah, the drinks that she bought, yes, she did go and get that drink for herself.

Officer Wagner explained that, when Xiao returned, she put the drink down and asked him to dance. Officer Wagner then testified:

[W]e began to dance, [and] I placed my hands on her hips, on her waist area[. I]t was a slow dance type of movement. She then pulled herself closer to me and put my hand around her back, and I could, and ... she then began to rub her pelvis against me. I then began to get an erection, she then began to rub her pelvis on my erection. She then said oh, what's this, and then began to grind harder on my [clothed] penis.

Officer Wagner explained that, after dancing, Xiao sat "very close to me, right next to me touching me, and ... she was rubbing my thigh with her hand" as they made "small talk."

According to Officer Wagner, he later offered to purchase Xiao another forty-dollar drink, and, "[w]hen she returned again, she put the drink down and asked me to dance again, ... and we began to dance in the same manner as before." He testified that Xiao "began again to grind her pelvis against my clothe[d] penis and that lasted for a lot of the dance. Toward the end of that dance, she actually squatted and rubbed her breasts against my [clothed] penis as well." When asked specifically "how many times approximately that evening did you offer to buy her forty-dollar drinks?" on direct examination, Officer Wagner responded, "I'm sure probably three. I really don't know."

On cross examination, Officer Wagner provided the following details regarding his encounter with Xiao:

Q. [By defense counsel] At the time that [Xiao] asked you to purchase a drink, did she offer to engage in any sexual contact with your conduct [sic]?

A. [By Officer Wagner] No, she didn't.

Q. Did she offer you a blow job?

A. No, she didn't.

Q. Did she offer to rub your penis?

A. No, she didn't.

**254**

Q. Okay. Did she offer to have intercourse with you?

A. No, she did not.

Q. So, there's no discussion at all of any quid pro quo for that forty-dollar drink, is that correct?

A. Correct.

. . . .

Q. [A]nd during the course of [Xiao rubbing her pelvis against you], did she say anything to you, such as, thank you for the drink, this is in return for what I purchased, what you purchased for me?

A. She did say thank you for the drink. She didn't say that this is in return for what you purchased for me.

Q. Okay. In fact, she just whispered to you thank you, is that correct?

A. Correct.

. . . .

Q. So, at no time during the course of this evening did she ever tell you I will do anything to you for that forty-dollar drink, is that correct?

A. Correct.

. . . .

Q. [A]nd during the course of the time where she rubbed her breasts on you, she never said to you that this is for the drink that you purchased for me, is that correct?

A. That's correct.

Officer Wagner additionally testified that Xiao never: (1) removed any clothing; (2) exposed herself in any way to him; (3) put her hand down his pants; or (4) put her mouth on him. Officer Wagner stated that there were other people in the karaoke room; in other words, it was not "a private place where no one could see [them] dancing."

With respect to Officer Wagner's perception of Xiao's conduct on the night in question, he testified as follows:

Q. [By defense counsel] So ... your whole mindset initially going into this establishment is you were looking for possible, as you said, prostitution activity, is that correct?

A. [By Officer Wagner] Correct.

. . . .

Q. [So e]verytime she touched you, correct, you put in your report that she rubbed herself against you while you were dancing, you considered that prostitution activity based on your mindset going in, is that correct?

A. Based on my training and experience, I believe that to be prostitution activity, yes.

Q. And you indicated while dancing she again rubbed her pelvis on [your] erect penis, and that to you is considered prostitution activity?

A. That in conjunction with the payment, yes.

Q. Payment for the drink?

A. Yes.

Q. She did get a drink, correct?

A. Yes, she did.

Q. And she drank it during the course of your sitting down with her and talking to you?

A. Yes, she did.

Q. So it's not like ... you gave her forty bucks and she got up and danced such as the situation we have a lap dance, is that correct?

A. That's correct.

Officer Wagner described their dancing as the type of dancing that he sees at dance clubs, *i.e.,* "dirty dancing." The defense described "dirty dancing" as involving people rubbing their bodies against the bodies of their dance partners.

During a brief redirect examination, Officer Wagner stated that he had, on previous occasions, purchased twenty-dollar drinks for Xiao at Club Sara Lee, and she had never asked him to dance. Following a brief recross and before Officer Wagner was excused, the trial court sought to clarify Officer Wagner's testimony and the following colloquy ensued:

THE COURT: A point of clarification. On direct, you said three times on [sic] this dancing occurred for forty-dollars and you said you don't remember. Then [defense counsel] says in your report it says two times. So, it would be two times, not three times?

THE WITNESS [By Officer Wagner]: The two times is for the prostitution violation. *There were more purchases during the evening.*

THE COURT: At forty dollars?

THE WITNESS: *At forty dollars.*

THE COURT: And no dancing takes place?

THE WITNESS: I can't remember, your Honor.

THE COURT: Okay, so you can't remember that, but you remember specifically two times there's dances at forty-dollars and *you remember purchasing her forty-dollar drinks later on but no dancing, is that the testimony?* I'm trying to clarify that[.]

THE WITNESS: *Yes.*

(Emphases added.) At that point, both counsel indicated they had no further questions based upon the court's clarifying questions. Thus, Officer Wagner was excused, and, thereafter, the prosecution rested.

The defense then moved for a judgment of acquittal, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 29(a) (2000),[5] stating:

[I]f the [trial c]ourt takes the facts in this case in the light most favorable to the [prosecution], it's clear from the testimony of [Officer Wagner] that there is no prostitution case in this matter. [I]f the [trial c]ourt takes the facts in the light most favorable to the [prosecution then] they have to prove that there's an offer and agreement to engage in sexual conduct for a fee.

Sexual conduct is the touching of the intimate parts of an actor who the person is not married to, nor living with. I think the evidence produced at this point in time is that the officer was not married, had never been married to [Xiao[6]] and the actual definition of sexual conduct includes not living with as well. So, that has not been proven.

But additionally, ... the uncontroverted evidence is that [Xiao] sat with this individual through the night, had a number of drinks. On ... two occasions, [he] purchased a forty-dollar drink which she, in fact, drank [and] got up and danced with him, and basically, that's the extent of the testimony of [Officer Wagner].

[Officer Wagner] indicated he got excited. [Xiao] said thank you after he [became] erect, and that was it. There was no discussion of any sexual conduct, intercourse, blow job or anything of any significance with reference to any sexual conduct.

So we believe at this juncture, even given the light most favorable to the [prosecution], the [prosecution] ha[s] not prove[n] the onus of the offense beyond a reasonable doubt.

In response, the prosecution asserted that it had made a *prima facie* case, specifically stating that:

Sexual conduct under [HRS § ]707–700 means any touching whether directly or through the clothing or other material intended to cover the sexual or other intimate parts. There was sexual conduct as defined by [HRS § ]707–700 in this case.

[Officer Wagner] specifically testified that [Xiao] was rubbing her pelvis and her breasts against his penis, [a] sexual ... intimate part[ ] that w[as] intended to be covered by clothing or other material.

The trial court orally denied Xiao's motion for judgment of acquittal, stating "[the trial c]ourt[,] taking the evidence in the light most favorable to the [prosecution,] believes that a *prima facie* case had been made by the prosecution." Xiao did not testify, invoking her right to remain silent, and the defense rested without calling any witnesses.

Thereafter, the following occurred:

THE COURT: So, Madam Prosecutor, you can argue first, or you just wanna

---

5. HRPP Rule 29(a) states in relevant part that: The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is

closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

6. During direct examination, Officer Wagner testified that he and Xiao have never been married.

argue and save for rebuttal? Whatever way.

[THE PROSECUTOR]: Yeah, I'll just——I'll incorporate my——

THE COURT: So, just rebut.

[DEFENSE COUNSEL]: Your Honor, we'd incorporate our previous argument. We'd only note at this juncture, your Honor, the [c]ourt must not take the evidence in the light most favorable to the [prosecution] but must find by proof beyond a reasonable doubt that there was an offer and agreement to engage in sexual conduct for a fee.

Clearly, the testimony of [Officer Wagner] indicates there was no verbal offer and agreement to engage in any sexual conduct for a fee. In fact, he testified as (indiscernible) did [Xiao] say ... if you buy me a drink that I will do X minus Z, at no time did that happen. In fact, during the course of the evening, apparently, [Officer Wagner] indicated that drinks were purchased other times and no contact was made between [Xiao] and the officer.

In fact, in this case, all that happened was that there was dirty dancing on the floor to the extent of what happened in this matter. If there was some other indicia that she had agreed to engage any [sic] sexual conduct such as when she was sitting down with him rubbing his penis or trying to take down his zipper or things of that nature, even offering and whispering in his ear, anything with regard to any sexual contact, it'd be a different situation.

We believe that the burden here is proof beyond a reasonable doubt, which is a high burden, and the facts in this case is just not, does not warrant what the legislature has determined to be prostitution in this case. So, we'd ask the [c]ourt to acquit [Xiao].

THE COURT: Okay.

[THE PROSECUTOR]: ... [Officer Wagner] testified that he had met with [Xiao] on several occasions previously. He had bought her twenty-dollar drinks several times prior to this. Never at that time did she ever offer to dance with him. It was only upon offering to buy her a forty-dollar drink that she asked him to dance and then subsequently engaged in the sexual contact.

And so, although not explicit in this case, your Honor, the [prosecution] would contend [that the prostitution statute] doesn't [require] an explicit will you touch my penis for forty-dollars. That is not necessary, but the implicit argument here is that [Officer Wagner] buys [Xiao] this forty-dollar drink, she dances with him. She then proceeds to touch his penis through the clothing. She did this twice in exchange for a forty-dollar drink.

So, therefore, your Honor, [the prosecution] would contend that there was an engagement and agreement and offer to engage in sexual conduct with another person not the spouse of the defendant for a fee.

Following closing arguments, the trial court found Xiao guilty as charged, stating:

[B]ased on the evidence presented, [the c]ourt does find that [the prosecution presented] credible testimony [establishing that Officer Wagner] entered the establishment on previous occasions, did not dance when purchasing twenty-dollar drinks. On the night of the offense, [he] purchased forty-dollar drinks twice and did, in fact, receive dances where sexual contact occurred between the parties.

The concern the [c]ourt had was that forty-dollar drinks were purchased after where no dancing took place, but had this been just a one-time forty-dollar drink and dance and then forty-dollars occurring after that and no dancing, I think the argument would be a strong argument for [Xiao], but based upon it occurring twice the same type of pattern, [the c]ourt does find that the [prosecution] has proven beyond a reasonable doubt that prostitution occurred. So, I'm gonna find [Xiao] guilty at this time.

Xiao was then sentenced, pursuant to the guidelines set forth in HRS § 712–1200(4), to six months probation, a $500 fine, a $75 probation fee, and $35 in court costs. On January 10, 2007, Xiao filed a timely notice of appeal. Her sentence was stayed pending appeal.

## B. *Appeal Before the ICA*

On direct appeal, Xiao argued that the trial court erred in denying her motion for judgment of acquittal and finding her guilty of prostitution, specifically contending that the prosecution failed to present sufficient evidence to support a *prima facie* case of prostitution, let alone a finding of guilt. Xiao asserted that, pursuant to HRS § 712–1200, the prosecution was required to prove—as an essential element of the offense—that Xiao had engaged in, agreed to, or offered to engage in some form of sexual conduct with Officer Wagner for a fee and that the prosecution failed to do so. She argued that she, in fact, never offered any sexual favors and that no specific sexual conduct was ever offered as a "quid pro quo" for a fee, drink, or otherwise.

In its answering brief, the prosecution maintained that there was sufficient evidence to support Xiao's conviction. The prosecution argued that:

HRS § 712–1200 specifies that a violation occurs "if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee." **While [Xiao] neither explicitly agreed nor offered to engage in sexual conduct, the conjunction "or" also allows for the violation of the statute by engaging in the activity without an explicit offer or acceptance.** A person may violate the statute by engaging in the prohibited activity *or* by agreeing or offering to do so.

(Bold emphasis added.) (Underscored emphasis in original.) The prosecution pointed to the following evidence in support of the trial court's verdict: (1) the categorization of drinks not as beer or wine, but instead as twenty- or forty-dollar drinks; and (2) Xiao's initiation of sexual contact—*i.e.*, rubbing her pelvis and breasts against Officer Wagner's penis—subsequent to Officer Wagner giving her forty dollars cash ("ostensibly to buy the more expensive drink") on two instances during the night in question. The prosecution further argued that a verbal agreement was not necessary; rather, there was an implicit understanding that Officer Wagner would obtain "something more" for giving Xiao forty dollars to purchase a drink (as opposed to the twenty-dollar drinks he had purchased in the past).

On November 13, 2009, the ICA issued its two-page, five-paragraph summary disposition order, affirming the trial court's December 12, 2006 judgment of conviction. *State v. Xiao*, No. 28370, 2009 WL 3792472 (App. Nov. 13, 2009) (SDO). Specifically, the ICA held, without elaboration, that,

[u]pon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Xiao's point of error as follows:

There was substantial evidence to convict Xiao of [p]rostitution. *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996).

SDO at 1. On December 3, 2009, the ICA filed its judgment on appeal. Xiao's timely application for a writ of certiorari, filed March 1, 2010, was accepted by this court on March 29, 2010.

## II. *STANDARD OF REVIEW*

 This court has long held that

evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction[.] The test on appeal is not whether guilt is established beyond a reasonable doubt, but *whether there was substantial evidence to support the conclusion of the trier of fact.* Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

*Eastman*, 81 Hawai'i at 135, 913 P.2d at 61 (emphasis added). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Fields*, 115 Hawai'i 503, 512, 168 P.3d 955, 964 (2007) (brackets omitted); *see also Eastman*, 81 Hawai'i at 135, 913 P.2d at 61.

## III. *DISCUSSION*

■ As previously indicated, Xiao, in advancing her position regarding insufficiency of the evidence, argues that "there [wa]s absolutely no evidence adduced that the drink[s] she received constituted a fee" and that any sexual conduct that went on between herself and Officer Wagner was "merely gratuitous." As previously quoted, *see supra* note 2, HRS § 712–1200 provides that:

> **Prostitution.** (1) A person commits the offense of prostitution if the person *engages in, or agrees or offers to engage in, sexual conduct with another person* **for a fee.**
>
> (2) As used in subsection (1), "sexual conduct" means "sexual penetration," "deviate sexual intercourse," or "*sexual contact,*" as those terms are defined in [HRS § ] 707–700.

(Bold emphasis in original.) (Underscored emphases added.) In turn, HRS § 707–700 defines "sexual contact" as

> any touching, other than acts of "sexual penetration," of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.[7]

HRS § 707–700 (Supp.2006). Based on the plain language, the statute provides three alternative means of committing the offense of prostitution, that is, the defendant must: (1) *engage* in "sexual conduct" with another *for a fee*; (2) *agree to engage* in "sexual conduct" with another *for a fee*; or (3) *offer to engage* in "sexual conduct" with another *for a fee*. Based on these alternatives, a defendant need not actually engage in the sexual conduct, but need only agree or offer to engage in such conduct, which is confirmed by our case law.

For example, in *State v. Connally,* 79 Hawaiʻi 123, 899 P.2d 406 (App.1995), HPD Officer Rick Orton was assigned to plainclothes duty to "enforce morals violations" in Waikiki. *Id.* at 124, 899 P.2d at 407. He observed Connally "walking back and forth on the [m]auka sidewalk of Kalakaua Avenue, approaching Japanese tourists as they passed by and attempting to talk to them or stop them." *Id.* (brackets omitted). Officer Orton began to follow Connally, who struck up a conversation with three Japanese males, saying, "Asobi masho ka?" ("Would you like to play?") and "Hyaku doru Aru?" ("Do you have a hundred dollars?"). *Id.* Officer Orton arrested Connally shortly afterward. *Id.* at 125, 899 P.2d at 408. Based on Officer Orton's testimony at trial, Connally was found guilty of prostitution, in violation of HRS § 712–1200(1), and she appealed. *Id.*

On appeal, Connally argued, *inter alia,* that there was insufficient evidence to support her prostitution conviction. *Id.* at 127, 899 P.2d at 410. Reviewing the statements made by Connally to the men on Kalakaua Avenue, the ICA stated:

> Whether the men responded to [the d]efendant's offers and the substance of their responses are irrelevant under the prostitution statute. *[The d]efendant merely had to offer to engage in sex in exchange for a fee.* Thus, based on Officer Orton's testimony and all other evidence adduced at trial, we conclude that there was sufficient evidence for the trial judge to find that [the d]efendant offered to engage in sexual conduct in exchange for money.

*Id.* (emphasis added). Accordingly, the ICA affirmed Connally's conviction. *Id.*

■ Both the ICA and this court have subsequently applied the *Connally* court's interpretation of the prostitution statute— *i.e.,* requiring, at minimum, evidence of an offer to engage in sexual conduct for a fee— in affirming convictions of prostitution where the offer or agreement to engage in sexual conduct for a fee was proven by statements made by the defendant. *See State v. Romano,* 114 Hawaiʻi 1, 7, 155 P.3d 1102, 1108 (2007) (concluding that the defendant mas-

---

7. HRS § 707–700 also provides definitions for "sexual penetration" and "deviate sexual intercourse"; however, inasmuch as there was no allegation or evidence at trial that Xiao engaged in, or agreed or offered to engage in those prohibited acts, our discussion is limited to "sexual contact" as statutorily defined.

seuse's responses to questions by an undercover officer regarding sexual services for an additional fee, when taken in context, was sufficient to sustain a prostitution conviction); *State v. Pegouskie*, 107 Hawai'i 360, 365–66, 113 P.3d 811, 816–17 (App.2005) (concluding that the defendant's statement quoting a price for sexual services was an offer and, when taken in context, was sufficient to sustain a prostitution conviction); *State v. Stanford*, 79 Hawai'i 150, 151–52, 900 P.2d 157, 158–59 (1995) (concluding that the defendant's one-word statement in Korean street vernacular, when considered with the defendant's subsequent actions, was sufficient to sustain a prostitution conviction); *State v. Kun Ok Cho*, 120 Hawai'i 256, 203 P.3d 676 (App. Mar. 12, 2009) (SDO). As in *Connally*, the defendants in these aforementioned cases did not actually engage in any sexual conduct because they were arrested immediately after making the offer or agreeing to engage in sexual conduct for a fee. Nevertheless, whether a defendant "engages in, or agrees or offers to engage in, sexual conduct with another person," each alternative requires that the "sexual conduct" be "for a fee."

In the instant case, Xiao clearly engaged in sexual conduct, *i.e.,* rubbing her body and her breasts up against Officer Wagner's clothed groin area, which clearly qualifies as "sexual contact." *See* HRS § 707–700 (defining "sexual contact" as "any touching ... of the sexual or other intimate parts of a person not married to the actor ... whether directly or through the clothing or other material intended to cover the sexual or other intimate parts"). Thus, given such conduct, the dispositive question distills to whether Xiao's engagement in the sexual conduct was "for a fee," thereby constituting the offense of prostitution under the first alternative means prescribed in HRS § 712–1200(1).

■ HRS chapters 712 and 707 do not provide a definition of "fee." Nevertheless, it is well-settled that, when a term is not statutorily defined, this court may resort to legal or other well accepted dictionaries as one way to determine its ordinary meaning. *See State v. Chen,* 77 Hawai'i 329, 337, 884 P.2d 392, 400 (App.1994); *see also Gillan v.* *Gov't Employees Ins. Co.,* 119 Hawai'i 109, 115, 194 P.3d 1071, 1077 (2008).

The word "fee," as it is commonly understood, means "[a] charge for labor or services, [especially] professional services." *Black's Law Dictionary* 690 (9th ed.2009); *accord Muse v. United States,* 522 A.2d 888 (D.C.1987) (concluding that, in the context of a solicitation for prostitution statute, "the term 'fee' ... refers to 'payment in return for professional services rendered' ").

The *Muse* court, in deciding whether a gold necklace constituted a fee, stated:

> The term "fee" as used in [District of Columbia Code (DC Code) ] § 22–2701.1(1) [ (1986 Supp.) (defining "prostitution" as "the engaging, agreeing to engage, or offering to engage in sexual acts or contacts with another person in return for a fee.") ] is not defined by statute, nor has it been construed by this court. In light of the underlying commercial nature of solicitation for prostitution, however, we conclude, as have courts in other jurisdictions considering the question, that **the term "fee" in this context refers to "payment in return for professional services rendered."**
>
> Given this definition of the term "fee," **we perceive no basis for adopting appellant's suggestion that the term be further limited to require "payment for professional services" in the form of money.** While our solicitation cases have typically concerned proposed exchanges of money for sexual acts, we see no reason why this commercial transaction could not involve payment in a form other than money. Indeed, in *Harris v. United States,* 293 A.2d 851, 854 (D.C.1972), *rev'd on other grounds,* 315 A.2d 569 (1974) (en banc), we recognized that "[a]n essential element of prostitution is money or *material gain* in exchange for illicit sexual activity." (Emphasis added.)

*Muse,* 522 A.2d at 890–91 (underscored emphasis in original) (bold emphasis added) (some citations and footnote omitted).

■ Inasmuch as HRS § 712–1200(1) is nearly identical to DC Code § 22–2701.1(1), quoted *supra,* we are persuaded by the District of Columbia Court of Appeals' interpre-

tation of the word "fee." We agree that a "fee" is not explicitly limited to monetary compensation, but includes payment in the form other than money and, therefore, conclude that a "fee," under the prostitution statute, is money or a "material gain" for sexual conduct. Consequently, as applied to the facts of this case, we also conclude that the forty-dollar drinks would constitute a fee under HRS § 712-1200(1).

■■■ The prosecution maintains that "[t]he circumstances surrounding Officer Wagner's investigation included the following uncontroverted facts[:] (1) that [Xiao] engaged in sexual conduct with Officer Wagner, and (2) that [Xiao] received [forty dollars] from Officer Wagner prior to each episode of sexual contact." In the prosecution's view, connecting these two "uncontroverted facts" equals prostitution. We cannot agree.

In *State v. Tookes,* 67 Haw. 608, 699 P.2d 983 (1985), this court stated that prostitution "is triggered by a sale of sexual services[.]" *Id.* at 614, 699 P.2d at 987. The dictionary defines "sale" as "the act of selling[.]" *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1989) at 1262. "Sell" is defined as "to persuade or induce someone to buy (something)[.]" *Id.* at 1296. Thus, in order to sustain Xiao's conviction for prostitution, there must be evidence of an understanding on the part of Xiao that the forty-dollar drink (*i.e.,* the "fee") paid for by Officer Wagner was to buy sexual favors from her. Without such evidence, there can be no prostitution.

The prosecution argues that, "[c]learly[,] there was *an implicit understanding* that Officer Wagner would obtain "something more" for giving [Xiao forty dollars] to purchase a drink, than he had when giving her [twenty dollars]." (Emphasis added.) The record, however, does not support the prosecution's inference drawn from Xiao's conduct that she "implicit[ly] underst[ood]" that the purchase of a forty-dollar drink was for sexual conduct.

The only witness to testify at trial was the officer investigating possible prostitution activity at Club Sara Lee, *i.e.,* Officer Wagner. According to Officer Wagner, after obtaining a drink for herself, which she had asked him to buy for her, Xiao asked him to dance. While they danced, Xiao rubbed his groin area with her pelvis. Subsequently, Officer Wagner offered to buy Xiao another drink. When she returned with her second drink, Xiao again asked him to dance and, while dancing, again rubbed his penis with her pelvis and her breasts. However, Xiao did not ask Officer Wagner to dance on the subsequent occasions when he purchased her additional forty-dollar drinks, and Officer Wagner admitted that he purchased more than two forty-dollar drinks. We, therefore, disagree with the trial court's characterization that the two drink purchases that led to Xiao's sexual conduct constituted a "pattern."

Moreover, at trial, defense counsel specifically asked Officer Wagner: "At the time that [Xiao] asked you to purchase a drink, did she offer to engage in any sexual contact with your conduct [sic]?" Officer Wagner replied "[n]o, she didn't." Defense counsel later inquired: "[D]uring the course of [Xiao rubbing her pelvis against you], did she say anything to you, such as, thank you for the drink, this is in return for what I purchased, what you purchased for me?" Officer Wagner replied that "[s]he did say thank you for the drink[but, s]he didn't say that this is in return for what you purchased for me." Based on such testimony, we cannot conclude—as the prosecution urges—that Xiao had "an implicit understanding" that Officer Wagner's purchase of the forty-dollar drinks was for sexual contact. Given the totality of circumstances, we believe that the prosecution failed to prove beyond a reasonable doubt that Xiao "engage[d] in sexual conduct with [Officer Wagner] for a fee."

## IV. CONCLUSION

Based on the foregoing, we hold that there was insufficient evidence to convict Xiao under HRS § 712-1200(1). We, therefore, vacate the ICA's judgment on appeal and reverse Xiao's conviction.

Concurring and Dissenting Opinion by
ACOBA, J.

While I concur in the result reached by the majority, I dissent as to the majority's defini-

tion of the term "fee," as used in Hawai'i Revised Statutes (HRS) § 712–1200(1) (1993),[1] to mean money or material gain for sexual conduct. In my view, the term "fee" must be strictly interpreted to refer to money or property. This narrower interpretation is mandated by the rule of lenity, which holds that where a criminal statute is ambiguous or susceptible to more than one construction, it must be strictly construed against the government, and by due process which requires that statutes must be construed in a manner that allows a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct. *See infra.*

## I.

The District Court of the First Circuit (the court) convicted Petitioner/Defendant–Appellant Jing Hua Xiao (Petitioner) for prostitution pursuant to HRS § 712–1200(1). The conviction arose from a police investigation during which Petitioner "slow" danced and "rubb[ed] her pelvis" against an undercover police officer after the officer purchased drinks for Petitioner. The question presented on certiorari is whether the Intermediate Court of Appeals (ICA) gravely erred in affirming Petitioner's conviction based on its conclusion that there was sufficient evidence to convict her of prostitution.

Petitioner maintains that "there is absolutely no evidence adduced that the drink [Petitioner] received constituted a fee." On appeal to the ICA, Petitioner argued that "[t]he term fee has not been defined by statute [and t]herefore, the common meaning of 'fee' is controlling." Thus, Petitioner asserted that "fee is money paid for a service." Petitioner further maintained that "[i]f the legislature in its wisdom had chosen to define

fee as property or the [sic] services, it would have done so." In support of this assertion, Petitioner noted that HRS § 712–1201 (1993)[2] "defines 'profits from prostitution' as accepting or receiving money or other property pursuant to an agreement." According to Petitioner, because no such definition was provided for the term "fee," it therefore "takes on the common meaning of monetary compensation." Petitioner argues in her Application that "there is absolutely no evidence adduced that would confirm that [Petitioner] received monetary compensation from anyone for the purchase of the drink." (Emphasis omitted.)

Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) argued on appeal to the ICA that "the term 'fee' is generally not limited to money or property." In support of its conclusion, Respondent stated that "fee" is defined as " 'a charge or payment for services, a sum paid or charge for a privilege; a gratuity or tip' " or as " 'payment asked or given for professional services.' " (Quoting *Random House Dictionary of the English Language* 521 (1973); *Webster's New World Dictionary* 496 (3d ed.1988).) Thus, Respondent maintained that payment "can easily involve other consideration [and t]here is no limitation, explicit or implied, that a 'fee' consists of only money, [because] a fee is simply *a payment, in whatever form,* given for 'professional services.' " (Emphasis added.) Respondent argued therefore, that nothing supported Petitioner's assertion "that the common meaning of fee is *'money paid for a service.'* " (Emphasis in original.)

## II.

The definition of the term fee includes "property, money; akin to ... money," "a fixed charge for admission (as to a museum)[,] a charge fixed ... by an institution (as

1. HRS § 712–1200(1) provides that "[a] person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee."

2. HRS § 712–1201, applicable to the offense of promoting prostitution, defines advancing prostitution as follows:

 A person "advances prostitution" if, acting other than as a prostitute or a patron of a prostitute, he knowingly causes or aids a

person to commit or engage in prostitution, procures or solicits patrons for prostitution, provides persons for prostitution purposes, permits premises to be regularly used for prostitution purposes, operates or assists in the operation of a house of prostitution or a prostitution enterprise, or engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.

a university)[,] ... compensation often in the form of a fixed charge for professional services[,]" "[to] give a gratuity [or tip,]" or "to reward or pay for ... personal services[.]" *Webster's Third New Int'l Dictionary* 833 (1961). Thus, the term "fee," as used in HRS § 712–1200(1), could be defined as money or property, or could be more broadly construed to include other forms of compensation or consideration.

However, where a criminal statute is susceptible of more than one construction, the narrower or stricter construction should be adopted pursuant to the rule of lenity. *State v. Bayly,* 118 Hawai'i 1, 15, 185 P.3d 186, 200 (2008) (stating that the rule of lenity "makes it more appropriate to adopt a less expansive meaning of the term 'collision'"); *State v. Aiwohi,* 109 Hawai'i 115, 129, 123 P.3d 1210, 1224 (2005) (stating that "if the language were viewed as ambiguous, the statute would ... have to be strictly construed in favor of [the defendant] and against the prosecution"); *State v. Shimabukuro,* 100 Hawai'i 324, 327, 60 P.3d 274, 277 (2002) (plurality opinion) ("Where a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity ... [and u]nder the rule of lenity, the statute must be strictly construed against the government and in favor of the accused."); *State v. Soto,* 84 Hawai'i 229, 247, 933 P.2d 66, 84 (1997) (stating that under the rule of lenity, it the court's task to construe the statute strictly); *State v. Bautista,* 86 Hawai'i 207, 210, 948 P.2d 1048, 1051 (1997) ("[A]mbiguous penal statutes are to be construed in favor of the accused." (Quoting *State v. Aluli,* 78 Hawai'i 317, 321, 893 P.2d 168, 172 (1995) (Brackets in original.))) (Other citation omitted); *see also, State v. Kaakimaka,* 84 Hawai'i 280, 292, 933 P.2d 617, 629 (1997) ("'Th[e] policy of lenity means that the court will not interpret a state criminal statute so as to increase the penalty that it places on an individual[.]'" (Quoting *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).)) (Brackets omitted.).

---

**3.** The statute in effect at the time of the alleged offense provided:

> **Inattention to driving.** Whoever operates any vehicle without due care or in a manner as to cause a *collision* with, or injury or damage

In *Bayly,* 118 Hawai'i at 3–4, 185 P.3d at 188–89, recently decided by this court, police officers were dispatched to a parking lot where Bayly's vehicle was found hanging off the concrete parking area. Following a field sobriety test, Bayly was arrested for operating a vehicle under the influence of an intoxicant (OUI). *Id.* at 4, 185 P.3d at 189. Bayly was subsequently charged with OUI and inattention to driving. *Id.* at 3, 185 P.3d at 188. Following a bench trial, the district court acquitted Bayly of the OUI charge but found him guilty of inattention to driving in violation of HRS § 291–12.[3] *Id.* at 5, 185 P.3d at 190. The ICA affirmed Bayly's conviction.

On certiorari, this court first turned to *State v. Williams,* 114 Hawai'i 406, 163 P.3d 1143 (2007), and explained that

> [t]his court recently examined, although in a different context, a similar "collision" requirement in HRS § 291E–21 (Supp. 2004), which mandates that police officers take a blood sample to determine intoxication in the event of a "collision" where the officer has probable cause to believe a person involved committed an enumerated traffic offense.

118 Hawai'i at 12, 185 P.3d at 197 (citing *Williams,* 114 Hawai'i 406, 163 P.3d 1143). It was noted that the dictionary definition of collision stated that " '[c]ollision' is defined as 'the action or an instance of colliding, violent encounter, or forceful striking together typically by accident and so as to harm or impede.'" *Id.* (quoting *Williams,* 114 Hawai'i at 410, 163 P.3d at 1147 (quoting *Webster's Third New Int'l Dictionary* at 446)). This court next examined *Alexander v. Home Insurance Co.,* 27 Haw. 326, 326–27 (Haw. Terr.1923), in which the sole question was whether the insurer was liable under the "collision clause" of its policy for damages which resulted when the insured's vehicle accidently capsized on to the road. *Bayly,* 118 Hawai'i at 12, 185 P.3d at 197. According to *Bayly,* the *Alexander* court, in con-

---

to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than thirty days, or both[.]

HRS § 291–12 (Supp.2006) (emphasis added).

cluding that the accident did not involve a collision, *"relied upon the generally accepted meaning of the word, rather than what it termed the 'technical lexicographical definition,'* under which the accident might be classified as the 'striking together of two bodies' and thus a 'collision.'" *Id.* at 13, 185 P.3d at 198 (citing *Alexander,* 27 Haw. at 328) (emphasis added). Notably, this court stated that *"the instant case arises under the penal law, where the basic canons of statutory construction counsel in favor of a less expansive definition[,]"* and "'[w]here a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity. Under the rule of lenity, the statute must be strictly construed against the government and in favor of the accused.'" *Id.* at 15, 185 P.3d at 200 (quoting *Shimabukuro,* 100 Hawai'i at 327, 60 P.3d at 277). Thus, this court declared that the rule of lenity "makes it more appropriate to adopt a less expansive meaning of the term 'collision.'" *Id.* This court therefore adopted the definition of "collision," which requires the vehicle make "contact with a 'perpendicular object obstructing the course of the vehicle's progress.'" *Id.* (quoting *Alexander,* 27 Haw. at 328 (brackets omitted)).

Hence, under principles of lenity, "the narrower or stricter construction [of the term fee] should be adopted." *Aiwohi,* 109 Hawai'i at 129, 123 P.3d at 1224 (stating that "if the language were viewed as ambiguous, the statute would ... have to be strictly construed in favor of [the defendant] and against the prosecution"); *Shimabukuro,* 100 Hawai'i at 327, 60 P.3d at 277 (plurality opinion) ("Where a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity ... [and u]nder the rule of lenity, the statute must be strictly construed against the government and in favor of the accused."); *Soto,* 84 Hawai'i at 247, 933 P.2d at 84 (stating that under the rule of lenity, it the court's task to construe the statute strictly); *Bautista,* 86 Hawai'i at 210, 948 P.2d at 1051 ("[A]mbiguous penal statutes are to be construed in favor of the accused." (Quoting *Aluli,* 78 Hawai'i at 321, 893 P.2d at 172. (Brackets in original.))); *Kaakimaka,* 84 Hawai'i at 292, 933 P.2d at 629 ("Th[e] policy of lenity means that the court will not interpret a state criminal statute so as to increase the penalty that it places on an individual[.]") (Brackets, internal quotation marks, and citation omitted.). Under the rule of lenity then, the term "fee" should be given the narrower or stricter construction referring to money or property.

## III.

Furthermore, due process mandates that "'[s]tatutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.'" *State v. Gaylord,* 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (quoting *State v. Lee,* 75 Haw. 80, 92–93, 856 P.2d 1246, 1254 (quoting *State v. Kameenui,* 69 Haw. 620, 621, 753 P.2d 1250, 1251 (1988))); *see also, Aiwohi,* 109 Hawai'i at 136, 123 P.3d at 1231 (Acoba J., concurring) ("Inhering in the [due process clause of the Hawai'i Constitution] is the premise that 'a penal statute is vague if a person of ordinary intelligence cannot obtain an adequate description of the prohibited conduct or [of] how to avoid committing illegal acts.'" (Quoting *State v. Kam,* 69 Haw. 483, 487, 748 P.2d 372, 375 (1988).)) (Brackets omitted.).

Consistent with the mandates of due process, under general principles of statutory construction, "[t]he words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words *as to their general or popular use or meaning.*" HRS § 1–14 (1993) (emphasis added). "Words are given their common meaning unless some wording in the statute 'requires a different interpretation.'" *Keliipuleole v. Wilson,* 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (quoting *Saranillio v. Silva,* 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995)) (other citation omitted).

Likewise, in *Bayly,* after reviewing the possible interpretations of the term "collision," this court determined that "[b]ased on *Williams* and *Alexander,* as well as the mandate of HRS § 1–14 that 'the words of a law be understood in their most known and usual signification,' ... *the term 'collision' in HRS*

§ 291–12 should be understood in a colloquial, rather than a technical sense." 118 Hawai'i at 14, 185 P.3d at 199 (brackets and ellipsis omitted). As previously stated, this court thus held that, " 'collision' generally refers to 'an automobile coming in contact with some other vehicle or some perpendicular object obstructing the course of its progress[,]' " because "the term 'collision' in HRS § 291–12 should carry its common meaning, and not the more expansive technical definitions used in some contexts." Id. at 14–15, 185 P.3d at 200.

It would seem that the term "fee" is most generally or popularly used to refer to money or property. The definition includes "a fixed charge for admission," "a charge fixed . . . by an institution," "compensation often in the form of a fixed charge," or "to give a gratuity [or tip]," most commonly requiring payment in money. Websters Third New Int'l Dictionary at 833 (emphases added). Thus, while one could imagine an infinite number of ways in which one could "reward or pay for . . . personal services," id., the term "fee" should be construed so as to "be understood in [its] most known and usual signification"—that fee refers to money or property. HRS § 1–14. This interpretation would afford a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited by the statute. See Gaylord, 78 Hawai'i at 138, 890 P.2d at 1178. Consequently, such an interpretation would comport with due process.

## IV.

However, the majority quotes Muse v. United States, 522 A.2d 888 (D.C.1987), where that court "recognized that '[a]n essential element of prostitution is money or material gain in exchange for illicit sexual activity.' " Majority opinion at 259, 231 P.3d at 976 (quoting Muse, 522 A.2d at 891 (emphasis in original)) (brackets in original) (bolded emphasis omitted). The majority, "persuaded by the District of Columbia Court of Appeals' interpretation of the word 'fee[,]' " as set forth in Muse, "agree[s] that a 'fee' is not explicitly limited to monetary compensation, but includes payment in the form other than money and, therefore, conclude[s] that a 'fee[ ]' . . . is money or a 'material gain' for sexual conduct." Id.

Additionally, the majority cites to State v. Tookes, 67 Haw. 608, 699 P.2d 983 (1985), for the proposition "that prostitution 'is triggered by a sale of sexual services[.]' " Id. at 260, 231 P.3d at 977 (quoting Tookes, 67 Haw. at 614, 699 P.2d at 987 (brackets in original)) (emphasis added). The majority asserts that "[t]he dictionary defines 'sale' as 'the act of selling[,]' ", or as " 'to persuade or induce someone to buy (something).' " Id. (quoting Webster's Encyclopedic Unabridged Dictionary of the English Language 1262 (1989)) (brackets omitted).

Of historical significance, this court was previously faced with the very question of the definition of the term fee under HRS § 712–1200(1) in State v. Makalii, No. 24832, 2002 WL 31230815, at *1 (Haw., Oct. 2, 2002) (SDO).[4] In responding to the majority's as-

---

4. Although the statutory term "fee" was construed in Makalii, 2002 WL 31230815, at *1, the decision was not published. The defendant pointed out that the opinion should have been published because,

[a]nnouncing, for the first time, that "fee" for purposes of prostitution means any "item of value" by way of an unpublished summary disposition order further erodes the probable constitutionality of the majority's interpretation. As an unpublished order, Hawaii's citizens remain unaware that prostitution, by judicial interpretation, consists of soliciting or engaging in sexual contact for any "item of value," which includes transportation. Thus, the majority's order does not inform Hawaii's citizens of what conduct is prohibited, nor how to act accordingly. Moreover, since the majority's order cannot be cited or relied upon as precedent, it fails to

provide the requisite guidance to police officers, judges, and juries. For example, the decision cannot be cited to judges as authority for crafting jury instructions. As such, juries will not be consistently and fully instructed on the law. 2002 WL 31230815, at *2 (Order Denying Reconsideration) (Acoba, J., dissenting, joined by Ramil, J.) (emphasis added).

For this reason,

[the] decision should [have] be[en] published, as was requested by Justice Ramil. See [Makalii, 2002 WL 31230815, at *1 n. 1 (SDO)] (Ramil, J., dissenting, joined by Acoba, J.) ("Because the case at bar raises a very important issue dealing with the statutory construction of the word 'fee,' I strongly feel that it is critical for this court to publish this opinion."). . . . We, as a court of last resort, should endeavor to provide guidance to the litigants

sertion that a "ride into town" in exchange for a "hand job" constituted a fee, Justice Ramil stated that "[t]he word 'fee' in [HRS § 712–1200] is commonly understood in our daily lives to mean money or other property. When one thinks of the word 'fee' the most common examples that come to mind are tuition fees, filing fees, or any tangible property given in exchange for professional services, admissions, tuition, etc." *Id.* (Ramil, J., dissenting, joined by Acoba, J.).

In the instant case, one describing a "fee" would not refer to it as "material gain" or a "sale," as the majority poses it. Majority opinion at 259, 231 P.3d at 976. "Were one to refer to [a fee] ... without giving further details, the mind of the auditor would naturally visualize" a payment for services in the form of money or property. *Alexander,* 27 Haw. at 328–29. Moreover, in my view, the concept of "material gain[,]" majority opinion at 259, 231 P.3d at 976, as an alternative means of proving that a person has "engage[d] in, or agree[d] or offer[ed] to engage in, sexual conduct with another person *for a fee* [,]" HRS § 712–1200(1) (emphasis added), further creates ambiguity with respect to the term "fee." Under the majority's definition of "fee," in the absence of evidence that the person accused of committing the offense of prostitution received monetary compensation, the prosecution, court, and alleged offender would have the daunting task of ascertaining whether the accused had obtained a "material gain." The concept of "material gain" only substitutes one ambiguity for another. While advocating "material gain" as an alternative means of proving the element of a "fee," the majority offers no explanation for, or guidance regarding, its definition. The difficulty in applying or ascertaining whether a "ride into town," *Makalii,* 2002 WL 31230815 at *1, or a single alcoholic drink constitutes a material gain is abundantly apparent. The concept of "material gain" is expansive and nebulous, and where we are

called upon to define an already ambiguous term, we should refrain from interpretations that serve only to produce another layer of ambiguity.

As reiterated, the majority cites *Tookes* for the proposition "that prostitution 'is triggered by a *sale* of sexual services[.]' " Majority opinion at 260, 231 P.3d at 977 (quoting *Tookes,* 67 Haw. at 614, 699 P.2d at 987 (brackets in original) (emphasis added)). The foregoing reference further injects ambiguity into HRS § 712–1200(1). That statute does not employ the term "sale" at all; to reiterate, HRS § 712–1200(1) requires proof that one "engage[d] in, or agree[d] or offer[ed] to engage in, sexual conduct with another person *for a fee.*" The majority's interpretation however, seemingly requires proof of elements beyond those set forth in the statute, i.e., a "sale."

## V.

In this case, the undercover officer purchased drinks for Petitioner. If Petitioner had actually "engage[d] in, or agree[d] or offer[ed] to engage in, sexual conduct for" money or drinks, such could, under appropriate circumstances, constitute a "fee" for purposes of HRS § 712–1200(1), inasmuch as, in my view, the term "fee" in HRS § 712–1200(1) would include money or property. While I disagree with the majority's construction of the term "fee," because I agree with the majority that there was insufficient evidence to convict Petitioner, I concur in the result.

and the courts. *See Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 326 n. 1, 47 P.3d 1222, 1239 n. 1 (2002) (Acoba, J., concurring) ("[W]e should endeavor to provide as much guidance as possible to the parties, counsel, and the trial courts[.]"). Our duty to do so in this case is obligatory for the reasons Defendant enumerates. *See* Shimamoto, *Justice is*

*Blind, But Should She be Mute?,* 6 *Hawai'i Bar Journal* 6, 7 (2002) (" 'A court of final decision, ... because it has the last word, must provide that word in order to incorporate the case into the body of law.' " (Quoting Hoffman, *Publicity and the Judicial Power,* 3 J.App. Prac. & Process 343, 348 (2001).)). *Id.*